IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| IN RE: CONSTELLATION ENERGY GROUP, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MASTER FILE NO.:<br>08-CV-2854-CCB |

**DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY
IN SUPPORT OF THEIR MOTIONS TO DISMISS**

James P. Gillespie, P.C. (*pro hac vice*)
Brant W. Bishop, P.C. (Bar No. 24829)
Jeffrey G. Landis (Bar. No. 17554)
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000
(202) 879-5200 (facsimile)
james.gillespie@kirkland.com
brant.bishop@kirkland.com
jeffrey.landis@kirkland.com

*Counsel for Constellation Energy Group, Inc.*


Robert J. Mathias (Bar No. 00253)
James D. Mathias (Bar No. 06311)
David Clarke, Jr. (Bar No. 02177)
DLA Piper US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-4000
(410) 580-3000 (facsimile)
robert.mathias@dlapiper.com
james.mathias@dlapiper.com
david.clarke@dlapiper.com

*Counsel for the Individual Defendants*

Michael K. Isenman (Bar No. 15396)
Goodwin Procter LLP
901 New York Avenue NW
Washington, DC 20001
(202) 346-4000 (Phone)
(202) 346-4444 (Fax)
misenman@goodwinprocter.com

Mark Holland (*pro hac vice*)
Mary K. Dulka (*pro hac vice*)
Catalina E. Azuero (*pro hac vice*)
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 813-8800 (Phone)
(212) 355-3333 (Fax)
mholland@goodwinprocter.com
mdulka@goodwinprocter.com
cazuero@goodwinprocter.com

*Counsel for the Underwriter Defendants*

Since Constellation Energy Group, Inc., the Individual Defendants, and the Underwriter Defendants (collectively, "Defendants") submitted their Reply briefs on the Motions to Dismiss, numerous courts from many Districts have issued opinions in securities matters that generally arose in the wake of the financial crisis of 2008. Defendants hereby submit a sampling of these decisions as supplemental authority as follows:

- *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143(WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010);

- *Yu v. State Street Corp.*, No. 08 Civ. 8235(RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010);

- *In re Taleo Corp. Securities Litigation*, No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010);

- *In re Security Capital Assurance, LTD. Securities Litigation*, No. 07 Civ. 11086(DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010);

- *In re IAC/InterActiveCorp Securities Litigation*, No. 04 Civ. 7447(RJH), 2010 WL 996483 (S.D.N.Y. Mar. 19, 2010); and

- *Waterford Township General Employees Retirement System v. BankUnited Financial Corp.*, No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010).

In each of these cases, the court analyzed claims of securities fraud or nondisclosure analogous to those raised by plaintiffs here and granted dismissal. In doing so, the court rejected many of the same arguments plaintiffs make in this case.

***Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143(WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010)**

In *Canadian Imperial Bank of Commerce* (attached as Exhibit 1), the court granted the defendants' motion to dismiss plaintiff's securities fraud and derivative control-person claims where the complaint was "bereft of factual allegations from which a reader could infer Defendants [acted] intentionally or recklessly." *Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *12.

The plaintiff in that case alleged that Canadian Imperial Bank of Commerce ("CIBC") and four of its officers misled investors about CIBC's exposure to fixed-income securities backed by subprime mortgages. By May 31, 2007 (the beginning of the class period), CIBC had allegedly accumulated $11.5 billion in assets collateralized by subprime loans, $3.5 billion of which was hedged through one counterparty — ACA Financial Guaranty Corporation ("ACA"). *Id.* at *3-4. Plaintiff alleged that defendants' public statements between May 31 and August 2007 regarding CIBC's exposure to the real estate market and collateralized debt obligations ("CDO") were materially false and misleading "for failing to disclose CIBC's true exposure of almost $12 billion." *Id.* at *3. Plaintiff further alleged that, because shares of ACA dropped from $15.00 to $5.17 per share between June and August 2007, CIBC should have disclosed that "hedges on [its] exposure were guaranteed by financially unstable counterparties," and written down significantly more than $290 million in August 2007. *Id.* at *3-4.

In the fall of 2007, press reports about ACA's deteriorating condition began to appear, with one reporter suggesting that ACA would file for bankruptcy. At the same time, CIBC continued to issue public statements regarding its exposure to CDOs and made additional incremental write downs of its investments without particularizing exposure to ACA. According to plaintiff, it was only after ACA announced it was bankrupt that CIBC "disclose[d] that ACA [] was the unnamed hedge counterparty for $3.5 billion . . . [and that] there [was] a reasonably high probability" that CIBC would incur a large write-off in its first quarter financial results. *Id*. at *5 (internal quotation marks omitted). CIBC then wrote down over $6 billion between January 2008 and the end of the class period. *Id.* at *6.

Plaintiff separately alleged that CIBC "misrepresented its measurement and management of risk" using a metric known as the Value-at-Risk ("VaR") indicator, which consisted of models

2

projecting "the potential loss that could occur in normal markets . . . within a certain confidence level." *Id.* at *6 n.1. According to plaintiff, the alleged misrepresentation occurred in part because CIBC based its VaR projections on overly optimistic bond default rates. *Id.* at *6.

Plaintiff alleged fraud, claiming defendants acted with "knowledge or reckless disregard of internal CIBC documents and records controverting their public statements." *Id.* at *6. Plaintiff also alleged that "Defendants' discussion of CIBC's subprime exposure, risk levels, and counterparty protection during the Class Period suggests they knew or should have known the company's statements on those topics were false and misleading," and that, because "securities and other instruments tied to subprime were core products, and a large revenue generator[]," at least one of the individual defendants "knew or should have known" that CIBC's statements were false. *Id.*

The court dismissed, finding a failure to plead scienter. The court first concluded that "[r]eviewing the entirety of the Complaint, there is no allegation that any Defendant benefited in 'a concrete and personal' way from the purported fraud." *Id.* at *9. The court noted that "it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating . . . or otherwise sustain the appearance of corporate profitability." *Id.* at *8 (internal quotation marks omitted). The court also observed that "Defendants did not sell their stock just prior to a price drop — a fact suggesting the absence of any nefarious motives." *Id.* at *9. This reasoning supports Defendants' arguments that plaintiffs here do not allege a sufficient motive to demonstrate a strong inference of scienter, and that the timing of any stock sales by the individual defendants does not suggest that such sales were made with insider knowledge concealed from the public. (*See* CEG Mem. at 43-44; CEG Reply Mem. at 6-7; Individual Defs.' Mem. at 7-9.)

The court next examined whether plaintiff adequately pled recklessness in alleging that defendants "knew facts or had access to information suggesting that their public statements were

3

not accurate or failed to check information that they had a duty to monitor." *Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *9 (internal citation and quotation marks omitted). The court explained that, to meet this standard, a complaint "***must specifically identify*** the reports or statements that are contradictory to the statements made." *Id.* (emphasis in original) (citation and internal quotation marks omitted). The court found plaintiff's complaint deficient because it did not "specifically identify[] any reports or statements or any dates or time frame in which Defendants were put on notice of contradictory information" and instead only "allege[d] perfunctorily that Defendants received information contradicting their public statements because they held management roles and monitored CIBC financial reports." *Id.* at *10 (citation and internal quotation marks omitted). Citing to *In re PXRE Group Limited Securities Litigation*, 600 F. Supp. 2d 510, 540 (S.D.N.Y. 2009), the court further reasoned that, even if defendants were on notice of the subprime housing crisis, "knowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud." *Id.* The same reasoning applies here where plaintiffs tender no particularized facts indicating that Defendants knew of either Lehman's imminent collapse or possessed reports or statements that contradicted the published collateral downgrade estimates. (*See* CEG Reply Mem. at 7, 17-19; Individual Defs.' Reply Mem. at 7-8.)

The court also rejected both plaintiff's reliance on newspaper articles discussing the concerns regarding ACA and plaintiff's attempt to "engraft a conscious intent to mislead" onto the mistake in the quantitative VaR prediction. With respect to the former, the court pointed out that all but one of the media reports relied on by plaintiff "provide only generalized forecasting and speculation about a looming subprime crisis" and that "Defendants were not obligated to respond to every potentially disparaging news story or to rebut the musings of the financial press." *Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *10-11. In doing so, the court cited to the recent

4

decision *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 514 (2d Cir. 2010) (attached as Exhibit 2), in which the Second Circuit similarly concluded that "[f]irms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press or even by directors." This reasoning supports Defendants' position that incorrect market rumors regarding supposed material exposure to Lehman Brothers cannot form the basis of plaintiffs' claim of failure to disclose. (*See* CEG Mem. at 16-18.)

For the VaR projection, the court concluded that, putting aside the question of whether the calculation was a forward-looking statement accompanied by meaningful cautionary language, even if the calculation was objectively false, "[o]ne cannot reasonably conclude that, because the VaR calculations were mistaken, Defendants had the subjective intent to defraud." *Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *11. The reasoning applies with equal force here: putting aside the question of whether the collateral downgrade estimate is a forward-looking statement, just because Constellation's estimate was incorrect does not mean Defendants are fraudsters. (*See* CEG Reply Mem. at 4-8; Individual Defs.' Reply Mem. at 5-6.)

The court also rejected plaintiff's arguments that CIBC should have recorded larger write downs, holding that, "[b]ecause the securities laws do not allow fraud by hindsight claims, after-the-fact allegations that statements in one report should have been made in earlier reports do not make out a claim for securities fraud." Finally, the court rejected the argument that CIBC should have disclosed its counterparty exposure to ACA earlier given the "plunge in [ACA's] stock price over the summer of 2007." *Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *12-13 (citation and internal quotation marks omitted). In doing so, the court concluded that "allegations regarding ACA [] are particularly tenuous because they rest on the notion that Defendants failed to disclose the internal financial information of a company **other than CIBC**." *Id.* at *13 (emphasis in

original).   Yet there were no allegations in the complaint "that Defendants knew of, had access to, or could collect information that ACA [] was on the verge of bankruptcy." *Id.*  This reasoning supports Defendants' argument that plaintiffs here fail to allege that Defendants knew of, or had access to, information that Lehman was on the verge of bankruptcy.  (*See* CEG Reply Mem. at 10.)

***Yu v. State Street Corp.*, No. 08 Civ. 8235(RJH) 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010)**

In *Yu* (attached as Exhibit 3), the court dismissed plaintiffs' complaint because allegations that a corporation's investments were riskier than advertised were premised on a "hindsight" view "from [a] vantage point on the other side of the financial crisis." *Yu*, 2010 WL 668645, at *6.

The plaintiffs in *Yu* brought securities fraud and control-person claims against State Street Corporation ("State Street"), State Street's investment management arm, and ten State Street executives or trustees. *Id.* at *1.  The plaintiffs alleged that the "defendants misrepresented the nature, extent, and consequences of the investments of" one particular State Street mutual fund, which wound down in 2008 due to losses from mortgage-backed securities. *Id.*  Plaintiffs' principal allegation was that the fund's offering documents falsely stated that the fund aimed to invest "primarily in a diversified portfolio of high-quality debt securities" when, in fact, the fund invested "primarily in risky mortgage-related investments which were not high-quality." *Id.* at *5 (internal citations and quotation marks omitted).  The court held that such allegations did not adequately plead falsity because a claim that the fund's investments were not "high-quality" as advertised was based on the market's subsequent revaluing of mortgage-related investments rather than on whether the fund's investments met the technical definition of "high-quality" as set forth in the offering documents themselves. *Id.*

In doing so, the court warned against parlaying the financial crisis into opportunistic securities claims based on hindsight:

> Of course, from our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the rating agencies did not perceive. And not surprisingly, the Fund sustained most of its calamitous losses on securities with the highest investment ratings. In hindsight, then, it could be alleged that investments that were viewed by defendants — and the marketplace — to be "high-quality . . . investment grade instruments" in fact stood on shaky foundations. ***But the accuracy of offering documents must be assessed in light of information available at the time they were published. A backward-looking assessment of the infirmities of mortgage-related securities, therefore, cannot help plaintiffs' case***.

*Id.* at *6 (internal citations omitted) (emphasis added). The same reasoning counsels for dismissal here, where plaintiffs proffer that Defendants should have anticipated unprecedented financial events and made decisions based on information that plaintiffs allege, only in hindsight, to have been apparent prior to the market collapse in 2008. (*See* CEG Reply Mem. at 16-17.)

***In re Taleo Corp. Securities Litigation*, No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010)**

In *In re Taleo Corp.* (attached as Exhibit 4), the Northern District of California granted defendants' motion to dismiss plaintiffs' securities fraud claims because plaintiffs' "allegations . . . [did] not demonstrate a strong inference of scienter" when analyzed individually or holistically. *In re Taleo Corp. Sec. Litig.,* 2010 WL 597987, at *11.

The *Taleo* plaintiffs alleged that the defendant corporation's erroneous reporting of revenues was part of a scheme by Taleo's management "to make it appear that Taleo was consistently delivering revenue at levels that exceeded analyst[] expectations" in order to increase the share price of Taleo's stock. *Id*. at *2 (internal quotation marks omitted). Plaintiffs argued they adequately pled scienter because "(1) the accounting fraud centered on Taleo's core operations; [and] (2) the GAAP violations were significant . . . ." *Id*. at *7.

The court disagreed, noting that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Id*. at *7 (internal citations and quotation marks omitted). Rather, plaintiffs "must allege facts to show that the defendants knew

7

specific facts at the time that rendered their accounting determinations fraudulent." *Id*. at *8 (internal citations and quotation marks omitted). The failure to allege such specific facts was fatal to plaintiffs' scienter allegations — particularly where the complexity of the accounting provision at issue, and the fact that the defendants had made the error consistently and transparently over a number of years, suggested that management was not aware of the error. *Id*. at *10.

This same reasoning applies to Defendants' arguments that a computational error does not support an inference of scienter and that plaintiffs' claims must be dismissed for their failure to plead specific facts that rendered fraudulent Constellation's collateral downgrade estimate. (*See* CEG Reply Mem. at 3-8.)

***In re Security Capital Assurance, LTD. Securities Litigation*, No. 07 Civ. 11086(DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010)**

In *In re Security Capital*, (attached as Exhibit 5), the court granted defendants' motions to dismiss a subprime-related securities class action against Security Capital Assurance ("SCA"), a holding company for financial guaranty insurance and reinsurance, and certain individual and underwriter defendants. Plaintiffs claimed that the defendants had misled investors about SCA's exposure to securities backed by subprime residential mortgages.

The court held that plaintiffs had not sufficiently alleged scienter. In doing so, the court rejected plaintiffs' argument that defendants misled investors "to present the impression of explosive growth in anticipation of its secondary offering," concluding that "the desire to inflate stock prices or the desire to maintain a false veneer of corporate profitability is not sufficiently concrete to allege motive." *Id.* at *24 (internal citations and quotation marks omitted).

The court also concluded that "Plaintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter." *Id.* at *25. Instead, "[w]here Plaintiffs contend defendants

had access to contrary facts, they must specifically identify the reports or statements containing that information." *Id.* at *24 (internal quotation marks omitted). The court also noted that "Plaintiffs may not proceed with allegations of fraud by hindsight, and allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not support a strong inference of scienter." *Id.* (internal citations and quotation marks omitted). The court further stated that "Defendants, like so many other institutions floored by the housing market crisis, could not have been expected to anticipate the crisis with the accuracy Plaintiffs enjoy in hindsight." *Id.* at *26 (internal citations and quotation marks omitted).

Lastly, the court held that plaintiffs had failed to plead loss causation adequately. The plaintiffs argued that the risk allegedly concealed by the defendants' misrepresentation "materialized over time," but the court ruled that the plaintiffs had not properly pled that it was the alleged incremental revelation of defendants' misrepresentations and not other events, such as the housing market crisis or actions by third parties, that caused the decline in SCA's stock price. *Id.* at *32. In this regard, the court noted — as the Defendants here have argued in reply (*see* Individual Defs.' Reply Mem. at 12-17) — that when the plaintiffs' loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that plaintiffs' loss was caused by defendants' alleged fraud decreases. *In re Sec. Capital*, 2010 WL 1372688, at *30.

***In re IAC/InterActiveCorp Securities Litigation*, No. 04 Civ. 7447(RJH), 2010 WL 996483 (S.D.N.Y. Mar. 19, 2010)**

Defendants contend that plaintiffs have failed to allege any facts demonstrating Defendants' actual knowledge of a trend, at the time of the June 2008 Debenture Offering, that Lehman would file for bankruptcy in September 2008. (*See* CEG Mem. at 39-41; CEG Reply Mem. at 9-11; Underwriter Defs.' Mem. at 16-19; Underwriter Defs.' Reply Mem. at 5-8.) Plaintiffs thus have

9

failed to state a Section 11 or 12(a)(2) claim based on a purported duty to disclose a known trend of that bankruptcy pursuant to Item 303.

Recent authority directly supports the Defendants' argument. In *In re IAC/InterActiveCorp,* (attached as Exhibit 6), the plaintiffs alleged that an internet travel company violated Section 11 because Item 303 required it to disclose a known trend of a decline in defendant's business due to hotels improving their own online capabilities. The court dismissed the plaintiffs' Section 11 claim because plaintiffs failed to identify any non-public information about such trends of the defendant's hotel suppliers, let alone that the defendant had "actual knowledge" about such trends, which actual knowledge "is an essential allegation for purposes of a claim based on Item 303." *In re IAC/InterActiveCorp*, 201 WL 996483, at *7 (internal citation and quotation marks omitted).

In reaching that holding, the court in *IAC/InterActiveCorp* relied upon another recent decision, *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010). The plaintiff in *Blackmoss* alleged that the defendant asset management company had materially increased its exposure to risky CDOs containing substantial amounts of subprime mortgage-backed securities, and asserted a Section 11 claim for failure to disclose a rising trend of subprime foreclosures and delinquencies at the time of the company's IPO, in violation of Item 303. *Id.* at *3. The *Blackmoss* court emphasized that "Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." *Id.* at *9. The court concluded that, "[b]ecause Plaintiff has failed to allege sufficient facts to establish Defendants' knowledge of a trend of rising foreclosure rates at the time the Registration Statement was filed, its claims based on violation of Item 303 are dismissed." *Id.* at *10. The same reasoning supports Defendants' argument that there was no "known trend" of Lehman's bankruptcy as of the June 2008 Debenture

Offering that needed to be disclosed under Item 303. (*See* CEG Mem. at 39-41; CEG Reply Mem. at 9-11; Underwriter Defs.' Mem. at 16-19; Underwriter Defs.' Reply Mem. at 5-8.)

***Waterford Township General Employees Retirement System v. BankUnited Financial Corp.*, No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)**

In *Waterford* (attached as Exhibit 7), the court granted defendants' motions to dismiss a securities fraud class action against three senior executive officers and the primary subsidiary of BankUnited Financial Corporation ("BankUnited"). Plaintiffs' complaint alleged that the defendants misled investors regarding the extent of BankUnited's exposure to subprime loans, its level of non-performing assets, and the strength of its underwriting process, based in part on a precipitous drop in BankUnited's share price in the third quarter of 2008. The court rejected all the plaintiffs' arguments and dismissed plaintiffs' Section 10(b) claims.

First, the court held that certain statements on which plaintiffs attempted to rely — such as descriptions of BankUnited's underwriting, appraisal, and credit standards as "strict," "stringent," "conservative," and "strong" — were mere corporate puffery and therefore immaterial and not actionable. *Waterford Twp.*, 2010 WL 1332574, at *8. Second, the court held that defendants' statements regarding the company's future economic performance were forward-looking statements protected by the safe harbor provision of the PSLRA, and, in any event, the statements were not shown to have been made with actual knowledge of their false or misleading nature. *Id.* at *9-11. Third, the court held that the plaintiffs failed to plead sufficiently that defendants' statements regarding the company's underwriting standards were false or misleading, finding the plaintiffs' allegations in that regard conclusory and unsupported. *Id.* at *11-12. Fourth, the court held that plaintiffs failed adequately to allege facts giving rise to a strong inference of scienter. *Id.* at *13. In doing so, the court held that a finding of scienter cannot be based merely on allegations "regarding Defendants' knowledge base and attendance at meetings." The plaintiffs' allegations of insider

stock sales during the class period were likewise insufficient to support a finding of scienter. *Id.* at *14. The holdings by the court in *Waterford* are consistent with Defendants' arguments that plaintiffs have failed to plead adequately any material misstatement or omission by Defendants or any specific facts giving rise to a strong inference of scienter. (*See* CEG Mem. at 21-44; CEG Reply Mem. at 2-24.)

Dated: April 16, 2010                                                    Respectfully Submitted,

/s/                                                                              /s/
James P. Gillespie, P.C. * (*pro hac vice*)              Michael K. Isenman (Bar No. 15396)
Brant W. Bishop, P.C. (Bar No. 24829)                 Goodwin Procter LLP
Jeffrey G. Landis (Bar. No. 17554)                          901 New York Avenue NW
Kirkland & Ellis LLP                                                 Washington, DC 20001
655 Fifteenth Street, N.W.                                       (202) 346-4000 (Phone)
Washington, D.C. 20005                                         (202) 346-4444 (Fax)
(202) 879 5000                                                          misenman@goodwinprocter.com
(202) 879 5200 (facsimile)
james.gillespie@kirkland.com                               Mark Holland (*pro hac vice*)
brant.bishop@kirkland.com                                   Mary K. Dulka (*pro hac vice*)
jeffrey.landis@kirkland.com                                  Catalina E. Azuero (*pro hac vice*)
                                                                                   Goodwin Procter LLP
*Counsel for Constellation Energy Group, Inc.*        The New York Times Building
                                                                                   620 Eighth Avenue
                                                                                   New York, NY 10018-1405
/s/                                                                              (212) 813-8800 (Phone)
Robert J. Mathias (Bar No. 00253)                          (212) 355-3333 (Fax)
James D. Mathias (Bar No. 06311)                         mholland@goodwinprocter.com
David Clarke, Jr. (Bar No. 02177)                           mdulka@goodwinprocter.com
DLA Piper US LLP                                                  cazuero@goodwinprocter.com
6225 Smith Avenue
Baltimore, Maryland 21209                                   *Counsel for the Underwriter Defendants*
(410) 580-4000
(410) 580-3000 (facsimile)
robert.mathias@dlapiper.com
james.mathias@dlapiper.com
david.clarke@dlapiper.com

*Counsel for the Individual Defendants*

12