UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

(NORTHERN DIVISION)

| | |
|---|---|
| In re CONSTELLATION ENERGY GROUP, ) INC. SECURITIES LITIGATION ) ) _____ ) ) This Document Relates To: ) ) ALL ACTIONS. ) ) _____ ) | No. 1:08-cv-02854-CCB |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Lead Plaintiff Ironworkers St. Louis District Council Pension Fund, with plaintiffs KBC Asset Management NV and MARTA/ATU Local 732 Employees Retirement Plan (collectively, "Plaintiffs"), hereby submit their response to (1) Defendants' Notice of Supplemental Authority in Support of their Motions to Dismiss (the "Notice of Supplemental Authority" or "Defs.' Not."), and (2) Defendants' Reply to Plaintiffs' Notice of Supplemental Authority ("Defs.' Reply to Pls.' Not."). In the Notice of Supplemental Authority and Reply to Plaintiff's Notice, Defendants attach and describe numerous cases, which are briefly discussed below:

1.      *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143(WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*")

Defendants cite *CIBC* (attached as Exhibit 1 to the Notice of Supplemental Authority) to support their argument that Plaintiffs have not adequately pleaded scienter. *CIBC*, however, is readily distinguishable.

As an initial matter, Plaintiffs need not plead scienter for purposes of their claims brought under the Securities Act of 1933 (Counts I, II and III). *See, e.g.*, *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 399 (D. Md. 2004) (Blake, J.) ("Unlike the anti-fraud provision § 10(b) which requires plaintiffs to prove scienter and reliance on the misleading statement, § 11 has generally been regarded as imposing a negligence or strict liability standard."). Hence, *CIBC*, as well as Defendants' other supplemental authority addressing scienter, is irrelevant to those claims.

For purposes of Plaintiffs' claims under the Securities Exchange Act of 1934 (the "1934 Act") (Counts IV and V), the allegations of the Amended and Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"), taken together, establish that Constellation and the Officer Defendants[1] satisfied the scienter requirement of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Plaintiffs direct the Court to the allegations of the Complaint and the relevant discussion in Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pls.' Opp."). *See* ¶¶232-49;[2] Pls.' Opp. at 6-7, 40-49, 50-54; *see also* ¶¶61-62, 69,

---

[1]     "Officer Defendants" refers to Defendants Mayo A. Shattuck III, Kenneth W. DeFontes, Jr., and John R. Collins.

[2]     "¶__" and "¶¶__" refer to paragraphs in the Complaint.

130, 145-46, 150, 182-83, 187; *see also* the discussion of *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010), *infra* at Point 3 (discussing Plaintiffs' scienter allegations).

Moreover, unlike the plaintiffs in *CIBC*, Plaintiffs have established the application of the core operations doctrine.  Defendants cannot plausibly deny knowledge of the essential business facts regarding counterparty risk exposure and downgrade collateral, especially when the Complaint alleges statements made by the Defendants indicating their awareness of these crucial business metrics.  *See*, *e.g.*, Pls.' Opp. at 52.  Thus, the *CIBC* court's holding regarding VaR projections (Defs.' Not. at 5) has no bearing on the Defendants' scienter, because the VaR calculations in CIBC were not an essential business metric that was crucial to CIBC's business survival.  *See* Pls.' Opp. at 51-52.  Here, Defendants were, at the very least, reckless in not knowing that their published downgrade collateral figures – a metric Defendant Shattuck conceded was "an important management tool" (¶¶9, 61, 235) – were not merely false, but *grossly* understated by hundreds of millions of dollars, because the Company's ability to do business depended on these figures.  *See* Pls.' Opp. at 3, 6-7, 8-10.

Defendants' reliance on *CIBC* for the proposition that "incorrect market rumors regarding supposed material exposure to Lehman Brothers cannot form the basis of plaintiffs' claim of failure to disclose" (Defs.' Not. at 5) is also inapposite.  As Plaintiffs explained in their Opposition, Defendants did, in fact, have material exposure to Lehman Brothers by virtue of Constellation's key counterparty relationship with Lehman.  Pls.' Opp. at 46.  Moreover, far from being "incorrect," this material exposure was **confirmed** by the reaction to the Lehman disclosure of the institutions that rated Constellation's all-important credit, and on which its business depended.  On September 17, 2008, barely a day after the Lehman disclosure, S&P stated that: (1) Constellation was facing an "acute crisis

- 3 -

of confidence"; (2) if Constellation could not shore up its balance sheet in the wake of the Lehman disclosure, "a multiple-notch downgrade [was] likely"; and (3) "[S&P did] not expect the [C]ompany to withstand such a rating action." ¶103.  Indeed, Constellation was forced to scramble for a "white knight" to save its business from the devastating "crisis of confidence" that resulted from its exposure to Lehman.  ¶¶105-08; *see generally* Pls.' Opp. at 46-47.

Finally, Defendants' attempt to analogize to the *CIBC* court's holding regarding CIBC's counterparty exposure to ACA necessarily fails (Defs.' Not. at 5-6) because here, unlike in *CIBC*, Constellation's very ability to survive as a business depended on its credit rating, which in turn depended on its risk exposure to its counterparties.  *See* Pls.' Opp. at 48-49.  CIBC, on the other hand, a banking institution, did not rely on such credit ratings for its very business survival.  Moreover, the *CIBC* court stated that there was "no allegation in the Complaint that Defendants knew of, had access to, or could collect information that ACA Financial was on the verge of bankruptcy."  2010 WL 961596, at *13.  Here, by contrast, Plaintiffs alleged that Constellation had put Lehman on its credit watch list "well before September [2008]."  ¶244.

### 2. *Yu v. State Street Corp.*, No. 08 Civ. 8235(RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010)

Defendants' reliance on *Yu* (attached as Exhibit 3 to the Notice of Supplemental Authority) is also misplaced.  Defendants may not argue that Plaintiffs are alleging "fraud by hindsight" relating to the "market collapse in 2008," when Plaintiffs have specifically described how the Defendants must have known about the Company's true exposure to a key counterparty, Lehman, especially when the Company's business viability was contingent on the credit risk of its counterparties.  *See* Pls.' Opp. at 46-47.  Moreover, the Complaint describes how Constellation put Lehman on its credit-watch list well before the Lehman disclosure in September 2008, confirming that counterparty credit (and corresponding exposure) was an essential metric carefully tracked by the Defendants.  *Id.* at 47.  *Yu*, by contrast, did not involve a key

business metric that was monitored by the defendants, but rather a large, **diversified** portfolio of debt

securities.  Defs.' Not. at 6.  Accordingly, Defendants' attempt to analogize to *Yu* fails.

### 3.   *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010)

*Taleo* (attached as Exhibit 4 to the Notice of Supplemental Authority), which Defendants cite in

support of their scienter argument, is also distinguishable.  Significantly, the *Taleo* court did not have before

it specific statements and admissions from the company's own executives regarding the significance, and

their monitoring, of the particular financial metric at issue.  *See Taleo*, 2010 WL 597987, at *9 (stating that

"the statements cited . . . demonstrate [only] that Murray and Sisodraker had a general knowledge of Taleo's

accounting procedures").  This generalized knowledge, which the *Taleo* court found to be deficient, stands

in stark contrast to Plaintiffs' specific allegations that the Defendants: (a) "regularly review[ed]" the

Company's liquidity needs to ensure that the Company's collateral requirements could be met; (b) stressed

that the computation of downgrade collateral requirements was an "important management tool" that

Constellation used to manage excess liquidity; and (c) asserted that they "actively monitor[ed]" the credit

portfolio of the Company's global commodities operation in order to  "reduce the impact of potential

counterparty default."  *See* ¶¶61-2, 69, 150, 235-36.

Given Defendants' admissions regarding the significance of the Company's liquidity and capital

obligations, as well as their close monitoring of them, their false and misleading statements regarding

liquidity and collateral requirements were, at a minimum, the result of recklessness.  *See* Pls.' Opp. at 43-44

(discussing that recklessness suffices to plead scienter).  Indeed, courts have held that a failure to monitor

and review critical information relating to a company's operations is probative of scienter.  *See, e.g., In re*

*Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (scienter adequately pleaded against

chief financial officer because he knew *or* failed to monitor important information concerning an impairment charge and stock buy-back program that had damaged the company's cash flow).

### 4.   *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, No. 07 Civ. 11086(DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010)

Defendants cite *Security Capital* (attached as Exhibit 5 to the Notice of Supplemental Authority) for three holdings:  (1) that "'the desire to inflate stock prices or the desire to maintain a false veneer of corporate profitability is not sufficiently concrete to allege motive'" (Defs.' Not. at 8) (quoting *Security Capital*, 2010 WL 1372688, at *24); (2) that neither a position in management nor allegations amounting to fraud by hindsight satisfies the scienter requirement (Defs.' Not. at 8-9); and (3) that the plaintiffs in *Security Capital* had not alleged loss causation because they had not "properly pled that it was the alleged incremental revelation of defendants' misrepresentations and not other events . . . that caused the decline in SCA's stock price" (Defs.' Not. at 9).  None of these holdings supports dismissal here.

For purposes of Plaintiffs' claims under the 1934 Act (Counts IV and V), Plaintiffs do not rely, in pleading scienter, on a "desire to maintain a false veneer of corporate profitability," on the mere management positions of the individual defendants, or on fraud by hindsight.  Instead, Plaintiffs have made detailed allegations of scienter as to both the corporate defendant and the Officer Defendants.  As discussed above, Plaintiffs direct the Court to the allegations of the Complaint and the relevant discussion in Plaintiffs' Opposition.  *See* ¶¶232-49; Pls.' Opp. at 6-7, 40-49, 50-54; *see also* ¶¶61-62, 69, 130, 145-46, 150, 182-83, 187; *see also* the discussion of *Taleo*, *supra* at Point 3 (discussing Plaintiffs' scienter allegations).

Just as a plaintiff need not plead scienter for purposes of its claims brought under the Securities Act of 1933 (Counts I, II and III) (*see Royal Ahold*, 351 F. Supp. 2d at 399), a plaintiff need not allege loss causation either.  *See*, *e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)

("plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation"). Thus, *Security Capital* is irrelevant to those claims.

For purposes of Plaintiffs' 1934 Act claims, loss causation need not be alleged with particularity,[3] and in any event *Security Capital* is completely distinguishable. There, the court found that "Plaintiffs' Complaint fails even to demonstrate a correlation between 'revealed' facts and a decline in SCA's stock price." 2010 WL 1372688, at *29. As the court noted, the stock price went ***down*** in reaction to misrepresentations and ***up*** in response to revelations of the truth. *Id.* In addition, the court found that not only had the plaintiffs made no effort to plead facts "which, if proven, would show that Plaintiffs' loss was caused by the Defendants' alleged misstatements, as opposed to the intervening events," but that the plaintiffs' allegations "themselves incorporate intervening events and actors, and at times present (rather inexplicably) wide event windows that welcome into their narrative noise and information from other events that make it difficult to isolate the impact of Defendants alleged misrepresentations, and their revelation to the market." *Id.* at *30.

Here, by contrast, the Complaint demonstrates a clear correlation between Constellation's revealed facts and a decline in its stock price. *See, e.g.*, ¶¶185-89 (day after Constellation revealed its massive misstatement of its downgrade collateral requirement, its stock closed down 16%, the largest drop in seven years); *see generally* ¶¶182-201, 250-52. Although these same allegations demonstrate that the movement in question is attributable to the fraud Plaintiffs' allege, as opposed to other market events (*see id.*), the United States Supreme Court has made it clear that a plaintiff need not disentangle the various potential

---

[3]       *See, e.g.*, *Chien v. Skybar Bio Pharm. Co.*, 256 F.R.D. 67, 73 n.3 (D. Conn. 2009) ("The Court is well aware that the element of loss causation is not subject to the heightened pleading standard of Rule 9(b) of the *Federal Rules of Civil Procedure*.") (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

causes of price movement at the motion to dismiss stage.  In *Dura*, the Supreme Court explicitly recognized

the existence of a "tangle of factors affecting price" (544 U.S. at 343), but nonetheless observed that "it

should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with

some indication of the loss and the causal connection that the plaintiff has in mind" (*id.* at 347).  Moreover,

because "'[d]isputes about loss causation turn primarily on questions of fact'" (*In re Comverse Tech., Inc.*,

No. 06-CV-1825 (NGG)(RER), 2006 WL 2792757, at *3 (E.D.N.Y. Sept. 27, 2006) (quoting *In re Tyco*

*Int'l Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006)), resolution of this question is not appropriate on a motion to

dismiss.  *See also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL

5178546, at *17 (S.D.N.Y. Dec. 23, 2009) (multiple experts retained to address "complex damage and loss

causation theories and analyses").

### 5.   *In re IAC/InterActiveCorp. Sec. Litig.*, No. 04 Civ. 7447(RJH), 2010 WL 996483 (S.D.N.Y. Mar. 19, 2010)

Defendants claim that Plaintiffs have failed to allege *any* facts showing that Defendants had actual

knowledge of a trend that Lehman Brothers would file for bankruptcy in September 2008.  Therefore,

Defendants contend, Plaintiffs have failed to state a Section 11 or 12(a)(2) claim based on a duty to disclose

a known trend of the Lehman bankruptcy under Item 303.  Defendants rely on *IAC* (attached as Exhibit 6 to

the Notice of Supplemental Authority) to support their position.

*IAC/InterActiveCorp* is readily distinguishable.  *IAC* involved a defendant company whose travel

section included subsidiaries such as Hotwire, Expedia, and Hotels.com that bought and sold blocks of hotel

rooms.  The plaintiffs alleged that IAC failed "to disclose unfavorable 'trends' or 'changes' in IAC's hotel

business during 2003" (*IAC/InterActiveCorp*, 2010 WL 996483, at *2), caused by increased competition

from IAC's suppliers, who were improving their own online sales capabilities.  The court rejected the

plaintiffs' claims that IAC did not disclose this "trend" because "IAC had already disclosed this fact." *Id.* at

*6.  Second, the court noted that the fact that hotel companies were improving their online presences was general knowledge, and that such information is not material because "it is already part of the total mix of information available to investors."  *Id.* at 7.  Here, however, even though the financial community knew generally of Lehman's deteriorating condition, Plaintiffs specifically allege that Constellation never revealed the true extent of its exposure to Lehman as a credit-counterparty, or Lehman's presence on Constellation's internal credit watch list.  ¶¶91-93, 244.

Finally, the court noted that "to the extent plaintiffs assert that IAC failed to disclose non-public information about trends of its hotel suppliers . . . they have not identified that information" nor have they "alleged that IAC had knowledge of such information."  *Id.*  But here, Plaintiffs adequately allege that Constellation realized the risk of a Lehman bankruptcy *specific to Constellation* during the Spring or Summer of 2008.  ¶244; Pls.' Opp. at 29-30.  Therefore, *IAC* does not support Defendants' argument that there was "no known trend" of Lehman's bankruptcy specific to Constellation.

### 6.  *Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332575 (S.D. Fla. Mar. 30, 2010)

Defendants cite *Waterford* (attached as Exhibit 7 to the Notice of Supplemental Authority) for a series of holdings regarding puffery, forward-looking statements, underwriting standards, and scienter. Because Plaintiffs' central allegations here – concerning Defendants' admitted misstatements of its downgrade collateral requirement, and the extent of its exposure to counterparty trading risk and, in particular, its exposure to Lehman – relate to matters of hard, historical fact, *Waterford* is of limited relevance to this case.  Moreover, in contrast to the plaintiffs in *Waterford*, Plaintiffs here have alleged much more in support of scienter than "'Defendants' knowledge base and attendance at meetings.'"  Defs.' Not. at 11 (quoting *Waterford*, 2010 WL 1332575, at *14).  *See* ¶¶232-49; Pls.' Opp. at 6-7, 40-49, 50-54; *see also*

¶¶61-62, 69, 130, 145-46, 150, 182-83, 187.  This Court, therefore, should accord *Waterford* little if any weight.

### 7. *Slayton v. American Express Co.*, No. 08-5442-cv, 2010 WL 1960019 (2d Cir. May 18, 2010)

Defendants cite the Second Circuit's recent decision in *Slayton* (attached as Exhibit 1 to Defs.' Reply to Pls.' Not.) as additional support for its argument that the PSLRA's safe harbor protects those statements alleged in the Complaint that are forward looking.  There are numerous reasons why *Slayton* does not further Defendants' argument.

*First*, Defendants are now contending, for the first time, that the safe harbor protects their admitted misstatement of Constellation's downgrade collateral requirement.  *See* Defs.' Reply to Pls.' Not. at 4. Defendants did not take this position in either their opening or reply memoranda of law on this motion, and they do not argue that anything in *Slayton* justifies this new position – indeed, they do not even acknowledge that it *is* a new position.  Because Defendants have admitted that their stated downgrade collateral requirement was incorrect *as a matter of historical fact at the time it was made*, the safe harbor for forward looking statements cannot apply to that misstatement.

*Second*, *Slayton* makes it clear that "cautionary language that is misleading in light of historical fact cannot be meaningful."  2010 WL 1960019, at *9.  Thus, under the first prong of the safe harbor test, the cautionary language on which Defendants rely with respect to forward-looking statements concerning expected earnings and future business prospects cannot be meaningful because it is undermined by the historical fact, existing at the time the cautionary statements were made, that Constellation's downgrade capital requirements were much higher than Constellation had represented.

*Third*, with regard to the second prong of the safe harbor test – which requires knowledge of the forward-looking statement's falsity – *Slayton* makes it clear that knowledge can be established through

- 10 -

circumstantial evidence (*id.* at *15), and that an allegation of motive helps establish the required knowledge. *Id.* Although the Second Circuit concluded that the plaintiffs in *Slayton* did not allege "any theory as to why the defendants would knowingly mislead investors" (*id.*), that is not true here. Plaintiffs allege that, because Constellation was in a liquidity crisis and desperately needed capital, "Defendants did not wish to take any action to jeopardize an offering in which they would be raising almost **half a billion dollars**. Hence, they chose to withhold the truth about the understatement until after the Offering." ¶11; *see also* ¶¶12, 240, 242, 245.

Moreover, Plaintiffs allege a host of evidence establishing that the inference of actual knowledge is at least as compelling as any competing inference of non-fraudulent intent. That evidence includes:

a.    The motive evidence just described – that Defendants did not wish to jeopardize the Offering. Indeed, Defendants' reluctance to bring their understatement of the Company's collateral requirements to the market's attention even ***after*** the Offering is clear even from Defendants' own version of events. During the August 27, 2008 Analyst Day meeting, Shattuck stated that the collateral issue had been discovered "in late July." Yet, during the Company's July 31, 2008 earnings conference call, Defendants failed to even mention the problem, despite its enormity. Instead, Shattuck used the call to reaffirm the Company's guidance and tout results that "significantly exceeded our expectations." ¶241. Moreover, the Company's misstatement of its downgrade collateral requirement was not new. It had been misstated at least as early as February 27, 2008 (¶¶127, 132), months before Defendants revealed the truth in August 2008.

b.    Defendant Shattuck admitted that "[t]he computation of downgrade collateral requirements is an ***important management tool***. We use this measurement to determine how much collateral will be required in the unlikely event that we are downgraded to below investment grade." ¶¶61, 235.

c.    Shattuck admitted that the Company used the downgrade collateral requirement to "manage our excess liquidity."  ¶¶62, 236.

d.    The Company admitted that "We continuously monitor our liquidity requirements" (¶¶145, 182) and "regularly review our liquidity needs" (¶¶69, 130, 146, 183).

e.    The Company admitted that "We actively monitor the credit portfolio of our global commodities operation to attempt to reduce the impact of potential counterparty default."  ¶¶150, 187.[4]

Because Defendants' truly forward-looking statements – concerning expected earnings and business prospects – were premised on known misstatements of historical fact concerning Constellation's downgrade collateral requirement, as well as omissions concerning the Company's counterparty relationships, the safe harbor does not protect Defendants as to *any* of the misstatements alleged in the Complaint.  Defendants' known misstatements and omissions concerning the Company's downgrade collateral requirements and counterparty relationships render false and misleading the Company's public statements about its expected earnings and business prospects.  Those forward looking statements are, in other words, belied by the existence of contrary historical fact, and were therefore knowingly false and misleading when made.[5]

---

[4]    For a fuller discussion of scienter, *see* ¶¶232-49; Pls.' Opp. at 6-7, 40-49, 50-54; *see also* ¶¶61-62, 69, 130, 145-46, 150, 182-83, 187.

[5]    *See also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading.").

8.      *Epirus Capital Management, LLC v. Citigroup, Inc.*, No. 09 Civ.
        2594(SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 28, 2010)

Defendants cite *Epirus Capital Management* (attached as Exhibit 2 to Defs.' Reply to Pls.' Not.) to

support their argument that the Court should discount Plaintiffs' claims because they are "based on the

market losses suffered during the worldwide financial crisis in 2008."  Defendants paint with too broad a

brush.

*Epirus* involved a sophisticated capital management company that bought collateralized debt

obligations ("CDOs") from Citigroup in March of 2007.  *Epirus*, 2010 WL 1779348, at *2.  Plaintiffs' basic

claims were that the defendants knew at the time they sold the CDOs that their underlying assets were

worthless, and that the assets were added to the CDOs after the deal was closed.  *Id.*  The court dismissed

plaintiffs' claims because they "rely on the fact that valuations provided by Citigroup from June through

October 2007 on their investment showed declines and that their equity investment ultimately lost

significant value."  *Id.* at *5.  Thus, the court concluded, "[w]hile great clairvoyance may have predicted the

upcoming market difficulties, failure to make such predictions does not constitute fraud."  *Id.*  Concerning

scienter, the court found that simply because defendants later revalued the assets after they were sold to

plaintiffs "does not mean that these assets were initially overvalued."  *Id.* at *6.

It is difficult to understand the application of these points to the case before the Court.  Plaintiffs here

are not claiming that Defendants could have ***predicted*** the exact date on which Lehman Brothers would go

under, even though there was general knowledge about Lehman's troubles.  Rather, they are claiming that

Defendants omitted disclosing information to Plaintiffs (and the market) about the extent of their serious

exposure to Lehman, information any investor would want to know.  Finally, the question of whether

Plaintiffs' losses here were ***caused*** by Defendants' alleged fraud or by "the worldwide financial crisis in

2008" is a factual matter not appropriate for adjudication at summary judgment.  Plaintiffs have alleged their

losses were caused by fraud, and a simple claim that such losses were an inevitable result of an economic downturn should be rejected.  *See, e.g.*, *In re Ambac Fin. Group, Inc. Sec. Litig.*, __ F. Supp. 2d __, __, 2010 WL 727227, at *21 (S.D.N.Y. Feb. 22, 2010) (rejecting defendants' argument that plaintiffs' "financial woes were caused by the global economic collapse and that this is a 'fraud by hindsight' case").

  **9.**  ***In re Century Aluminum Co. Sec. Lit.*, Nos. C 09-1001 SI, 2010 WL 1729426 (N.D. Cal. Apr. 27, 2010)**

  Defendants' reliance on *Century* (attached as Exhibit 3 to Defs.' Reply to Pls.' Not.) is unavailing.  In *Century*, the Court recognized the Ninth Circuit's two "narrow conditions" where scienter can be inferred from the publication of inaccurate financial information.  2010 WL 1729426, at *6-7 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009)).  Those two exceptions are:  (i) where there are allegations of management's role in the corporate structure combined with detailed and specific allegations about management's exposure to the facts; or (ii) where the information is so readily apparent it would be ridiculous to suggest management was unaware.  Both conditions are present here.

  As discussed above, CEO Shattuck admitted that the downgrade collateral requirement was a key metric.  *See* ¶¶9, 61 ("The computation of downgrade collateral requirements is an ***important management tool***. We use this measurement to determine how much collateral will be required in the unlikely event that we are downgraded to below investment grade.").  Moreover, the Complaint describes how important Constellation's merchant energy business was, accounting for 73% of revenues by 2003.  *See* ¶51.  Also, Constellation acknowledged the importance of trading counterparties, and the Company's public filings admit that management regularly reviewed the Company's liquidity needs to ensure it had adequate facilities available to meet collateral requirements.  *See* ¶69.

- 14 -

Factually, *Century*, is also distinguishable.  After its discussion of the "core operations" theory, the Northern District of California dismissed the plaintiffs' claims based on the court's finding that the alleged misrepresentation was "largely definitional."  *Id.* at *7.  Before its Restatement, Century had classified certain cash elements of a transaction as "Cash Flows From Operating Activities" instead of as "Cash Flows From Financing Activities."  The correction of this definitional error had no effect on Century's bottom-line. This is easily distinguishable from the case at bar, where Defendants' "error" was understating by over $1.6 billion the amount of additional collateral it would have had to post had there been a triple-level downgrade. *See* ¶¶4, 71-72, 149.

DATED:  May 26, 2010

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK T. MILLKEY
MARIO ALBA JR.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mmillkey@rgrdlaw.com

*Lead Counsel for Plaintiffs*

BROWN, GOLDSTEIN & LEVY LLP
DANIEL F. GOLDSTEIN (01036)
DANA W. McKEE (04447)
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone:  410/962-1030
410/385-0869 (fax)
dfg@browngold.com
dwm@browngold.com

*Liaison Counsel*

MOTLEY RICE LLC
JAMES M. HUGHES
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9440 (fax)
jhughes@motleyrice.com

*Counsel for  KBC Asset Management NV*

LABATON SUCHAROW LLP
MARK S. ARISOHN
HOLLIS L. SALZMAN
BENJAMIN D. BIANCO
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
marisohn@labaton.com
hsalzman@labaton.com
bbianco@labaton.com

*Counsel for MARTA/ATU Local 732 Employees
Retirement Plan*