**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

In re CONSTELLATION ENERGY  :
GROUP, INC. SECURITIES  :
LITIGATION  :  CIVIL NO. CCB-08-2854
  :
...o0o...

## MEMORANDUM

Now pending before the court are motions to dismiss filed by Constellation Energy

Group, Inc. ("Constellation"), certain officers ("officer defendants")[1] and directors ("director

defendants")[2] of Constellation (collectively "individual defendants"), and several financial

institutions that served as underwriters to Constellation ("underwriter defendants").[3]  Plaintiffs

Ironworkers St. Louis District Council Pension Fund ("Ironworkers"), KBC Asset Management

NV ("KBC"), and MARTA/ATU Local 732 Employees Retirement Plan ("MARTA"),

collectively the "plaintiffs," have brought a consolidated class action alleging violations of the

Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act").  The

lawsuit is brought on behalf of all persons and entities that acquired Constellation's publicly

traded securities between January 30, 2008 and September 16, 2008 (the "Class Period").  Such

securities include Constellation common stock and Series A Junior Subordinated Debentures

("Subordinated Debentures") issued pursuant to the registration and prospectus governing

---

[1]    The officer defendants are Mayo A. Shattuck III, Kenneth W. DeFontes, and John R.
Collins.

[2]    The director defendants are Douglas L. Becker, James T. Brady, James R. Curtiss,
Freeman A. Hrabowski III, Nancy Lampton, Robert J. Lawless, Lynn M. Martin, and Michael D.
Sullivan.  Defendant Shattuck is both an officer defendant and a director defendant.  (*See* Pls.'
Opp'n Mem. at 2 n.2.)

[3]    The underwriter defendants are Merrill Lynch, Fenner & Smith Inc., Citigroup Global
Markets Inc., Morgan Stanley & Co. Inc., UBS Securities LLC, and Wachovia Capital Markets
LLC.

Constellation's June 27, 2008 Subordinated Debentures offering (the "Offering"). The issues in this motion have been fully briefed and the court heard oral argument on June 17, 2010. For the following reasons, the defendants' motions will be granted in part and denied in part.

## BACKGROUND

Constellation is a publicly traded energy company located in Baltimore, Maryland, that provides power to Maryland customers through its regulated utility, Baltimore Gas and Electric Company ("BGE"), and to nationwide customers through subsidiaries. Since the late 1990s, Constellation also has operated an unregulated merchant energy business that involves, among other things, the generation and supply of wholesale power, energy risk and portfolio management, and energy trading.

Defendant Mayo A. Shattuck III has been President and CEO of Constellation since November 2001, and Chairman of the Board since July 2002. Defendant Kenneth W. DeFontes, Jr., has been President and CEO of BGE and Senior Vice President of Constellation since October 2004. Defendant John R. Collins has been CFO of Constellation since May 2007 and Executive Vice President since July 2007. Defendants Douglas L. Becker, James T. Brady, James R. Curtiss, Freeman A. Hrabowski III, Nancy Lampton, Robert J. Lawless, Lynn M. Martin, and Michael D. Sullivan all serve on Constellation's board of directors and did so during the Class Period. Defendants Citigroup Global Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Inc., UBS Securities LLC ("UBS"), and Wachovia Capital Markets, LCC, are all financial services entities that acted as underwriters for Constellation during the Offering, helping to draft and disseminate the Offering documents.

Lead plaintiff Ironworkers purchased Subordinated Debentures of Constellation in the Offering and purchased Constellation common stock during the Class Period. Plaintiffs KBC

and MARTA purchased common stock during the Class Period.

Over time, Constellation's unregulated energy activities have come to generate the majority of the company's revenues. (*See* Compl. ¶ 51 (citing Constellation's Form 10-K for 2003, filed on March 10, 2004).) Although highly profitable at first, Constellation's merchant energy business also carried great risk. For instance, energy trading required Constellation to post considerable cash collateral, which would increase if Constellation's credit rating dropped. In addition, Constellation was exposed to the credit risks of its trading partners, or "counterparties," that could fail to perform their end of a contract at any point.

Liquidity was essential to Constellation's merchant energy business, and Constellation undertook a public offering of the Subordinated Debentures on June 27, 2008, to raise capital for increased liquidity. On July 24, 2006, Constellation filed a registration statement and prospectus for the Offering. The registration statement was signed by all individual defendants except Defendant Collins. Subsequently, on June 23, 2008, four days before the Offering, Constellation filed a prospectus supplement. The prospectus and the prospectus supplement explicitly incorporate by reference numerous other documents filed with the Securities and Exchange Commission ("SEC") including: (1) a Form 8-K filed on January 30, 2008; (2) Constellation's Annual Report on Form 10-K for the year that ended December 31, 2007 ("2007 10-K"); (3) a Form 8-K filed on April 30, 3008; 4) a Form 10-Q for the quarterly period ending March 31, 2008, filed on May 9, 2008 ("First Quarter 10-Q"); and "any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 from now [July 24, 2006] until the time the registration becomes effective and thereafter until we sell all the securities." (*See id.* at ¶¶ 65 & 163.) The Offering resulted in the sale of 18 million shares at $25.00 per share, with proceeds for Constellation of approximately $435.8 million before

expenses.  (*Id*. at ¶ 66.)

Approximately six weeks after the Offering, on August 11, 2008, Constellation released its Form 10-Q for the quarterly period that ended June 30, 2008 ("Second Quarter 10-Q").  In this report, Constellation acknowledged that it had incorrectly calculated its cumulative obligations in the event of a credit rating downgrade in its First Quarter 10-Q as a result of an error in an automated system.  While the previous 10-Q had stated that the cumulative obligations were $320 million for a one-level downgrade, $626 million for a two-level downgrade, and $1,608 million for a three-level downgrade, the correct figures were $129 million, $844 million, and $3,234 million, respectively.  (*Id*. at ¶ 69 & 72.)  Thus, the incorrect calculations had overestimated the amount of collateral needed in the event of a one-level downgrade, while underestimating the amount of collateral needed by $218 million in the event of a two-level downgrade, and by $1,626 million in the event of a three-level downgrade.  (*Id*. at ¶ 71.)  Constellation also announced in the Second Quarter 10-Q that as of July 31, 2008, the cumulative obligations were estimated to be $106 million for a one-level downgrade, $681 million for a two-level downgrade, and $3,365 million for a three-level downgrade.  (*Id*. at ¶ 72.)

On August 12, 2008, the day after Constellation disclosed its corrected collateral figures, Constellation's shares closed at $61.25 per share, down 16 percent, the largest drop in seven years.  (*Id*. at ¶ 73.)  The following day, August 13, Standard & Poor's lowered Constellation's credit rating by one level from BBB+ to BBB, and UBS downgraded Constellation from Buy to Neutral.  (*Id*. at ¶ 74.)  On August 19, 2008, Fitch, another rating agency, downgraded Constellation's Issuer Default Rating from BBB+ to BBB, citing Constellation's "disclosure on August 11 that its need for additional liquidity to meet potential collateral requirements in the event of a downgrade of two or three notches is substantially higher than previously reported."

(*Id*. at ¶ 76.)

The price of Constellation's Subordinated Debentures also dropped following the August 11 announcement, but fared somewhat better than the price of Constellation common stock. On August 12, 2008, the Subordinated Debenture price fell from $24.99 per share to $23.89. (*Id*. at ¶ 4.) Beginning August 13, 2008, however, the Debenture price remained constant or increased every day thereafter and eventually closed at $25.09 on August 28, 2008, above the offering price of $25.00. (Ex. A to the Declaration of Mark Holland, Esq., attached to the Underwriter Defs.' Mem.)[4] Constellation points out that the average closing price for the twenty days preceding the August 11 First Quarter 10-Q was $24.71, whereas the average closing price for the twenty days following August 11 was $24.59, or 99.52 percent of the pre-disclosure twenty-day period. (*See id*.; Constellation Mem. at 11.)

At an August 27, 2008 analyst meeting, Defendant Shattuck acknowledged the underreported collateral figures and disclosed that the problem had been discovered "in late July" and "quantified in early August." (Compl. ¶ 77.) There had been no mention of the problem, however, during Constellation's July 31, 2008, earnings conference call. (*Id*.) On August 29, 2008, Constellation's stock closed at $66.71 per share. (*Id*. at ¶ 88.)

Constellation's share price fell even further in September 2008, as the financial markets imploded. On September 15, 2008, Lehman Brothers Holdings Inc. ("Lehman") filed for Chapter 11 bankruptcy protection, and Constellation's share price fell to $47.99. (*Id*. at ¶ 94.) After the close that day, Constellation filed a Form 8-K with the SEC disclosing the business relationships that Constellation and its subsidiaries had with Lehman and its subsidiaries. (*See*

---

[4]    A court "may take judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000)).

*id*. at ¶ 96.)[5]  But the September 15, 2008 8-K also sought to reassure the market that Lehman's bankruptcy would not have a material impact on Constellation and its business.  On September 16, 2008, the last day of the Class Period, Constellation's shares closed at $30.76 per share, down another $17.23, or 36 percent.  (*Id*. at ¶ 98.)  In addition, between August 11 and September 16, 2008, the price of the Subordinated Debentures dropped 52 percent, to $12.99 per share.  (*Id*. at ¶ 252.)  On September 16 alone, the price of the Subordinated Debentures fell 48 percent.  (*Id*. at ¶ 6.)

As part of several efforts to calm the market, on September 19, 2008, Constellation announced a merger agreement with MidAmerican Energy Holdings Company, owned by Berkshire Hathaway, Inc., which had agreed to purchase all of the outstanding shares for a total of approximately $4.7 billion.  (*Id*. at ¶¶ 105 & 107.)  This announcement stabilized Constellation's stock price, but on December 17, 2008, the two companies called off the deal.  Instead Constellation announced that it had entered an agreement under which EDF Development Inc. would acquire a 49.99 percent interest in Constellation Energy Nuclear Group, LLC for $4.5 billion.  (*Id*. at ¶ 108.)

The plaintiffs allege that although Constellation did not disclose its relationship with Lehman until Lehman's bankruptcy in September, Constellation was aware of Lehman's deteriorating financial condition during the spring and summer of 2008, and at the time of the Offering.  In particular, they allege that, according to a confidential source ("CS 1"), who was formerly an International Treasury Analyst at Constellation, Constellation put Lehman on its

---

[5]     The complaint alleges that Constellation owned 5.4 percent of Lehman (*see* Compl. ¶ 97).  Although the plaintiffs had a good faith basis for this allegation at the time of filing, they have since withdrawn it after learning that it was incorrect.  (*See* docket entry no. 102.)

internal credit-watch list "well before September [2008]."  (*Id*. at ¶ 244.)[6] CS 1 allegedly stated

that Constellation put Lehman and other financial institutions on the credit-watch list specifically

because of concerns about their viability and the possibility of bankruptcy.  (*Id*.)

In addition to alleging that the defendants misstated Constellation's collateral

requirements in the First Quarter 10-Q and failed to disclose the extent of Constellation's

exposure to Lehman, the plaintiffs also allege that the defendants made a series of other false and

misleading statements during the Class Period.  (*See id*. at ¶¶ 112 – 202.)  Without describing the

allegations in detail here, the plaintiffs allege, in sum, that the defendants made misleading

statements about Constellation's future earnings and business outlook, as well as about

Constellation's risk management and internal controls.

The complaint also contains allegations of insider trading.  The plaintiffs allege that: (1)

Defendant Shattuck sold 50,000 shares of Constellation stock on February 7, 2008, for proceeds

of $4,681,500; (2) Defendant Collins sold 10,000 shares of Constellation stock on February 1,

2008, and 5,000 shares on May 12, 2008, for proceeds of $1,353,800; (3) Defendant DeFontes

sold 3,640 shares of Constellation stock on February 12, 2008, for proceeds of $349,877; and (4)

Defendant Martin sold 950 shares on June 9, 2008, for proceeds of $83,733.  (*Id*. at ¶¶ 13 &

247.)

Based on these alleged facts, the plaintiffs bring five causes of action.  In Counts I and II

Ironworkers alleges, on behalf of Subordinated Debenture purchasers,[7] that all defendants

violated §§ 11 and 12(a)(2) of the 1933 Act by making misrepresentations and omissions in the

registration statement and prospectuses for the Offering.  Ironworkers alleges in Count III that

---

[6]      The complaint explicitly excludes this allegation from Counts I through III.  (*See* Compl.
¶ 232.)

[7]      Ironworkers is the only named plaintiff that purchased Subordinated Debentures during
the Offering.

the officer and director defendants are liable as control persons under § 15 of the 1933 Act for the violations alleged in Counts I and II.  On behalf of common stock purchasers, all plaintiffs allege in Count IV that Constellation and the officer defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 by making the same misrepresentations and omissions with respect to the Offering, as well as others occurring between the Offering and the end of the Class Period.  Finally, the plaintiffs allege in Count V that the officer defendants are liable under § 20(a) of the 1934 Act for the violations alleged in Count IV.

## ANALYSIS

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997).  "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints."  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set forth

sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

I.      *Counts I & II: Sections 11 & 12(a)(2) of the 1933 Act*

Ironworkers alleges, on behalf of Subordinated Debenture purchasers, that all defendants violated §§ 11 and 12(a)(2) of the 1933 Act by making misrepresentations and omissions in the registration statement and in the prospectuses for the Offering with regard to: (1) Constellation's downgrade collateral obligations as described in the First Quarter 10-Q; (2) Constellation's exposure to Lehman; and (3) Constellation's future earnings, business outlook, risk management, and internal controls. The defendants argue that Counts I and II should be dismissed because Ironworkers has not adequately pled a misleading statement or omission of material fact. In addition, the individual and underwriter defendants argue that Count II should be dismissed as to them because Ironworkers has not alleged that they purchased any security directly from any individual or underwriter defendant.

A.      *Materiality*

Section 11 of the 1933 Act imposes a duty of truthful disclosure as to an issuer's registration statements for securities. *See* 15 U.S.C. § 77k(a). An issuer must disclose any "material fact required to be stated therein." *Id.* Section 12(a)(2) applies to prospectuses for securities. *See* 15 U.S.C. § 77l(a)(2). Both §§ 11 and 12(a)(2) "prohibit materially false statements or omissions, although proof of scienter is not required." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008). In other words, "[l]iability is virtually absolute, even for

negligent or innocent misstatements." *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 818 (D. Md. 2002) (internal citation omitted).

For a misrepresentation to violate securities law it must be material. *Id.* at 815; *see also Greenhouse*, 392 F.3d at 655. Securities laws prohibit any misrepresentation or omission of fact that is deemed material, but not a misrepresentation – no matter how willful – of an immaterial fact. *Greenhouse*, 392 F.3d at 656. In other words, "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Id.* (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (internal quotation marks omitted).

Materiality is a "mixed question of law and fact." *Id.* at 657. Nevertheless, materiality may be decided by a court as a matter of law where no reasonable jury could find the fact material.[8] *Id.* The question of materiality is an objective one. *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 454 (D. Md. 2000). A fact is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Greenhouse*, 392 F.3d at 656 (quoting *Basic*, 485 U.S. at 231-32) (internal quotation marks omitted). The inquiry is whether, read as a whole, the offering documents "would have misled a reasonable investor about the nature of the securities." *Recupito*, 112 F. Supp. 2d at 455.

Under some circumstances, the materiality of certain misstatements or omissions may be negated. The Private Securities Litigation Reform Act ("PSLRA"), enacted in 1995, provides a safe harbor for statements identified as "forward-looking statements" if they are (1) accompanied

---

[8]     Because §§ 11 and 12(a)(2) are based in negligence and do not require a showing of scienter, generally the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) do not apply to such claims. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 402 (D. Md. 2004). But where a plaintiff's § 11 or § 12(a)(2) claim sounds in fraud, it must be pled with particularity. *Cozzarelli*, 549 F.3d at 629. Here, the defendants have not argued that Counts I and II sound in fraud.

by "meaningful cautionary statements" or (2) immaterial. 15 U.S.C. § 77z-2(c)(1)(A); 15 U.S.C.

§ 78u-5(c)(1)(A).[9] Even prior to the enactment of the PSLRA, the Fourth Circuit held that

certain predictive statements "not worded as guarantees are generally not actionable under the

federal securities laws." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (internal

quotation marks and citation omitted).

Under the PSLRA, a "forward-looking statement" is defined to include "a statement

containing a projection of revenues, income (including income loss), earnings (including

earnings loss) per share, capital expenditures, dividends, capital structure, or other financial

items," as well as "a statement of the plans and objectives of management for future operations,

including plans or objectives relating to the products or services of the issuer", and "a statement

of future economic performance." 15 U.S.C. § 77z-2(i)(1); 15 U.S.C. § 78u-5(i)(1). Even if an

unidentified forward-looking statement by a business entity has no accompanying cautionary

language, liability only attaches if the plaintiff proves that the statement was "(I) made by or

with the approval of an executive officer of that entity; and (II) made or approved by such officer

with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C.

77z-2(c)(1)(B)(ii); 15 U.S.C. § 78u-5(c)(1)(B)(ii).

Similarly, under the judge-made "bespeaks caution" doctrine, "cautionary language in an

offering document, as part of the 'total mix' of information, may negate the materiality of an

alleged misstatement or omission." *Recupito*, 112 F. Supp. 2d at 455 (citing *Gasner v. Bd. of*

*Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996)). But vague or boilerplate disclaimers will not.

---

[9]     The safe harbor described in § 77z-2 applies to statements covered by the 1933 Act, and
§ 78u-5 applies to statements covered by the 1934 Act. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727,
729 (7th Cir. 2004). The sections are "identical in all significant respects." *Id*. Accordingly,
when considering the applicability of the PSLRA's safe harbor the court will consider cases
addressing 1934 claims in addition to those addressing 1933 Act claims.

*Id.* Instead, to negate the materiality of an alleged misstatement or omission, the offering documents must "contain detailed and meaningful cautionary language tailored to the specific risks the company faces." *Id.* The safe harbor provision of the PSLRA and the bespeaks caution doctrine, however, apply "to forward-looking statements *only,* and not to material omissions or misstatements of historical fact." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (emphasis in original).

Other statements are simply not material. For instance, "[s]oft expressions of optimism which are analogous to 'puffing' have been held not to constitute actionable misrepresentations." *USEC*, 190 F. Supp. 2d at 822 (internal citation omitted); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (explaining that "expressions of puffery and corporate optimism do not give rise to securities violations"). Statements of puffery lack materiality because the market is not affected by such vague assertions. *Raab*, 4 F.3d at 289.

### 1.    *Downgrade Collateral Obligations*

Although the defendants do not dispute the inaccuracy of the statements made in the First Quarter 10-Q as to Constellation's downgrade collateral requirements, they argue that the statements were not material and therefore not actionable under §§ 11 and 12(a)(2). Specifically, they contend that the downgrade collateral figures were merely forward-looking estimates based on hypothetical future events. A reasonable investor, argue the defendants, would have understood the estimates to be moving targets that were likely to change by the time an actual downgrade occurred. Constellation points out that language accompanying the collateral estimates informed investors that "[b]ased on market conditions and contractual obligations at the time of a downgrade, we could be required to post collateral in an amount that could exceed

the amounts specified above, which could be material" (Constellation Mem. Ex. E at 41),[10] and

claims, therefore, that a reasonable investor would not rely on the specific numbers cited in the

First Quarter 10-Q.

The court disagrees. First, it cannot be said as a matter of law that the inaccurate

downgrade collateral estimates were forward-looking. Although the calculations described

Constellation's additional collateral obligations in the hypothetical event of a credit rating

downgrade, they were a snapshot of Constellation's contractual provisions at a specific point in

time. Thus, they were not simply a projection of future financial circumstances, but rather a

calculation of the collateral obligations that existed for the company in the event of a downgrade

as of March 31, 2008. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir.

2008) (holding that the defendant's "backlog" was a "snapshot of how much work the company

has under contract right now, and descriptions of the present aren't forward-looking").

Constellation's argument that by the time the numbers were announced on May 9, 2008,

they were outdated only reinforces this point. In fact, by May 9, the figures were better

described as historical rather than current, because they were based on Constellation's contracts

as of March 31. In other words, although articulated in terms of a contingency, the importance

of the calculations was their assertion about the state of Constellation's debt obligations

historically, on March 31. *See Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705

(7th Cir. 2008) (explaining that "a mixed present/future statement is not entitled to the safe

---

[10]     The court may consider Constellation's mandatory SEC filings on this motion to dismiss
because the plaintiffs have incorporated them by reference into the complaint. *See Am.
Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (explaining that
"[a]lthough as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage,
we have held that when a defendant attaches a document to its motion to dismiss, a court may
consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly
relied on in the complaint and [if] the plaintiffs do not challenge its authenticity") (internal
quotation marks and citation omitted) (alterations in original).

harbor with respect to the part of the statement that refers to the present"). Accordingly, unlike a prediction of future earnings or a prediction of Constellation's collateral obligations as of some date in the future, the calculations published in the First Quarter 10-Q were not forward-looking and therefore are not protected by the PSLRA's safe harbor, nor by the bespeaks caution doctrine.

Second, it cannot be said as a matter of law that the downgrade collateral estimates were immaterial. Rather, given the importance of liquidity to Constellation's merchant energy business (*see* Compl. ¶ 61 (citing Defendant Shattuck's statement during the August 27, 2008 analyst meeting that "[t]he computation of downgrade collateral requirements is an important management tool")), an investor would likely have viewed the figures in the First Quarter 10-Q as significant as part of the total mix of information available. *See, e.g., In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 286 F. Supp. 2d 1047, 1056 (D. Minn. 2003) (holding that "[b]ecause Xcel itself claimed that its trading business was an important part of its overall strategic plan, a reasonable investor could have seen improper trades and artificially inflated revenue as material matters"). Contrary to what Constellation argues, the fact that the estimates as of March 31 would have changed by the time an actual downgrade occurred, and indeed would have changed even by the time the First Quarter 10-Q was issued on May 9, does not mean an investor would not rely on them as an indicator of Constellation's overall liquidity position.

In addition, although the debenture price dropped only $1.10 immediately following the August 11 announcement, and increased steadily thereafter for several weeks, this does not mean that the miscalculated collateral estimates were immaterial as a matter of law. *See Greenhouse*, 392 F.3d at 660-61 (explaining that "[t]he extent to which a district court may look at a stock's

price history to determine whether a fact was material is a difficult issue on which courts take varying positions.  The majority rule seems to be that it can be *some* evidence, but not, standing alone, *dispositive* evidence") (emphasis in original).  This fact ultimately may counsel against materiality, but it is not dispositive at this stage in the litigation.  *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2004) (explaining that "[i]n order to take this decision away from the jury, the circumstances must make it obvious why a reasonable investor would not be concerned about the facts misrepresented").[11]

Therefore, Constellation's misstatement as to its downgrade collateral obligations was not immaterial as a matter of law, and the defendants' motion to dismiss will be denied as to that statement.  For the following reasons, however, the defendants' motions to dismiss Ironworkers' §§ 11 and 12(a)(2) claims will be granted as to the remaining alleged misrepresentations and omissions.

### 2.    *Exposure to Lehman*

Ironworkers has not adequately pled a misrepresentation or omission of material fact with regard to Constellation's relationship to Lehman.  Ironworkers alleges that the registration statement and prospectuses were misleading because they failed to disclose the extent of Constellation's exposure to Lehman's credit risk before Lehman's bankruptcy.  Ironworkers further alleges that under Item 303(a) of SEC Regulation S-K ("Item 303(a)"), Constellation was required to disclose the "nature and extent of its exposure to Lehman".  (Compl. ¶ 166.)  Given that Ironworkers has now withdrawn its allegation that Constellation owned 5.4 percent of Lehman, however, it is unclear what material exposure to Lehman Constellation failed to disclose.  In its September 15, 2008 8-K, Constellation stated that although its business units had

---

[11]    The court also notes that Constellation's common stock price fell 16 percent immediately after the August 11 announcement.

"business relationships with subsidiaries of Lehman," it "did not have any direct net credit exposure" to Lehman. (*See* Constellation Mem. Ex. B at 2.) Ironworkers has not alleged that the September 15, 2008 8-K was itself misleading,[12] nor are there any other allegations regarding the specific nature of Constellation's exposure to Lehman. On its own, the drop in Constellation's stock price following the announcement of Lehman's bankruptcy on September 15, 2008, is insufficient to infer that Constellation was materially exposed to Lehman's credit risk, given the extensive turmoil in the market at the time. (*See, e.g.,* Compl. ¶¶ 98 & 100.)

Moreover, Constellation warned in the prospectus that "Constellation Energy's merchant energy business may incur substantial costs and liabilities and be exposed to price volatility and counterparty performance risk as a result of its participation in the wholesale energy markets." (Constellation Mem. Ex. D at S-13.) This same warning appeared in Constellation's 2007 10-K (*see id.* Ex. C at 18), and was incorporated by reference into Constellation's First and Second Quarter 10-Qs. (*See id.* Ex. E at 45 & Ex. F at 51.) As no material exposure to Lehman has been alleged, and Constellation warned generally of counterparty risks, a failure to name Lehman specifically as a counterparty in the offering documents is not an actionable omission. *See, e.g., Recupito*, 112 F. Supp. 2d at 457 (dismissing §§ 11 and 12(a)(2) claims based on alleged omissions where the "Prospectus warned investors of the very risks Plaintiff claims were not disclosed").

---

[12]     Although the plaintiffs argue in their opposition brief that the September 15, 2008 8-K was also misleading because it did not disclose the true extent of Constellation's relationship with Lehman, this allegation does not appear in the complaint. Rather, the complaint merely alleges that "[o]n the evening of September 15, 2008, Constellation issued a press release disclosing the extent of its subsidiaries' counterparty and other business relationships with Lehman and Lehman's subsidiaries." (Compl. ¶ 199.) In fact, the complaint's only allegation that the September 15, 2008 8-K was itself misleading is that it did not mention that Constellation owned 5.4 percent of Lehman (*see id.* at ¶ 97), an allegation which has since been withdrawn. Moreover, the plaintiffs have not explained in their briefs what specific exposure Constellation should have disclosed in the September 15, 2008 8-K.

Additionally, Ironworkers has not sufficiently alleged that the defendants knew more than the market did about Lehman's volatile situation prior to Lehman's bankruptcy, such that they should have specifically disclosed the risks posed by Constellation's counterparty relationship to Lehman. The complaint alleges that "[w]hile the investment community was well aware of Lehman's deteriorating financial state during the spring and summer of 2008, and aware that Constellation had some exposure to Lehman, they were unaware of the extent of that exposure." (Compl. ¶ 93.) It further alleges that "while . . . the likelihood of a default by Lehman was becoming increasingly likely and apparent in the spring and summer of 2008, Defendants did not reveal the extent of that exposure before Lehman went into bankruptcy." (*Id*.) These allegations acknowledge that the public was aware of both Lehman's financial condition, and that Constellation had "some exposure" to Lehman. (*See also id*. at ¶ 243 (alleging that "Defendants were aware, as indeed the whole market was, of the substantial financial distress in which Lehman found itself during the summer of 2008").) Constellation was not required to disclose in the offering documents that it, like the rest of the market, might have had concerns about Lehman, given that no material exposure has been alleged. *See, e.g., Raab*, 4 F.3d at 291 (explaining that the defendant "had no duty to advise investors of what was already commonly known").

Likewise, Ironworkers has not adequately alleged a violation of Item 303(a), pursuant to which an issuer is required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[13] For the duty to disclose to be triggered, the issuer must have actual knowledge of a trend or

---

[13] This is the only specific provision of Item 303 cited in the complaint.

uncertainty. *See J & R Marketing, SEP v. Gen. Motors Corp.*, 549 F.3d 384, 391 (6th Cir. 2008). There is no additional duty to investigate. *See id*.

But Ironworkers has not adequately pled that the defendants had actual knowledge of Lehman's impending bankruptcy. First, the complaint contains no allegations suggesting that the underwriter defendants had any knowledge of Lehman's potential collapse. Second, the only allegation Ironworkers relies upon to suggest that Constellation and its officers and directors had knowledge of Lehman's deteriorating situation is that, according to CS 1, Constellation placed Lehman on its credit-watch list "well before September [2008]." (Compl. ¶ 244.) This allegation, however, is "explicitly excluded from Counts I through III" of the complaint (*id*. at ¶ 232), and should therefore not be considered by the court here.[14] But even were the court to consider this allegation, it implies nothing more than that Constellation had some concern about Lehman's financial condition, a concern the complaint itself acknowledges the rest of the market shared in the spring and summer of 2008. (*See id*. at ¶¶ 93 & 243.) The complaint does not allege that CS 1 had information about the criteria used for putting a company on the list, or the details surrounding the decision to put Lehman on it, and thus CS 1's statement does not reasonably lead to the inference that Constellation was materially exposed to Lehman, nor that Constellation knew Lehman was headed into bankruptcy. Because Ironworkers has not adequately alleged that the defendants *knew* Lehman was on the verge of bankruptcy, no violation of Item 303(a) has been pled. Ironworkers has failed, therefore, to allege a material misrepresentation or omission of material fact with regard to Constellation's exposure to Lehman sufficient to state a § 11 or § 12(a)(2) claim.

---

[14]     Although paragraph 12 of the complaint also alleges that Constellation put Lehman on an internal credit watch list before September 2008, it provides no factual basis for this allegation.

### 3. Statements Concerning Future Earnings, Business Outlook, Risk Management, and Internal Controls

The third category of alleged misrepresentations and/or omissions alleged by Ironworkers pertains to statements about Constellation's future earnings and business outlook, as well as about Constellation's risk management and internal controls. (*See id*. at ¶¶ 112 – 202.)[15] None of the alleged misstatements, however, can survive the defendants' motions to dismiss.

Although they will not all be detailed here, the alleged misrepresentations and omissions include, for example, statements in the January 30, 2008 8-K that Constellation's future financial outlook was positive: (1) Constellation "reaffirmed earnings guidance for 2008 at $5.25 to $5.75 per share and expects to be in the middle to upper end of the range. Looking forward to 2009, the company expects to grow earnings 15 to 20 percent over projected 2008 earnings"; and (2) "In coming years, we see clear and substantial earnings growth drivers and believe we are well positioned to deploy capital to pursue strategic market opportunities." (*Id*. at ¶¶ 113 & 114.) The plaintiffs allege these statements were misleading because they failed to disclose, among other things, the impact that turmoil in the credit markets was having on Constellation's merchant energy business, the extent of Constellation's counterparty relationship with Lehman, and the likelihood that rising commodity prices in 2008 would require Constellation to make margin payments on out-of-the-money contracts and larger up-front collateral positions. (*See id*. at ¶ 111.)

Also alleged are supposed misstatements about Constellation's risk-management activities to monitor its liquidity requirements, including, for example, statements in

---

[15] Not all of the misstatements alleged in paragraphs 112-202 pertain to Ironworkers' 1933 Act claims, as only those made in the registration statement and prospectuses, and the documents incorporated by reference therein, are actionable. All those made during the Class Period, however, pertain to the plaintiffs' 1934 Act claims.

Constellation's 2007 10-K that: (1) "[our risk management] program is predicated on a strong risk management culture combined with an effective system of internal controls"; and (2) Constellation "regularly review[s] our liquidity needs to ensure that we have adequate facilities available to meet collateral requirements", (*id*. at ¶¶ 129 & 130), as well as a statement in the First Quarter 10-Q that "[w]e continuously monitor our liquidity requirements and believe that our facilities and access to the capital markets provide sufficient liquidity to meet our business requirements." (*Id*. at ¶ 145.) Further alleged are statements in the registration statement and prospectus that: (1) the "risks [of counterparty relationships] are enhanced during periods of commodity price fluctuations. Defaults by suppliers and other counterparties may adversely affect Constellation Energy's financial results"; and (2) "[a] downgrade in Constellation Energy's credit ratings could negatively affect its ability to access capital and/operate its wholesale and retail competitive supply businesses." (*Id*. at ¶¶ 159 & 161.) The plaintiffs allege that these statements were misleading in part because they misrepresented the sufficiency of Constellation's liquidity and the amount of collateral the company would require in the event of a downgrade, as well as the sufficiency of its internal control and risk management functions to monitor the company's collateral and/or liquidity requirements. (*Id*. at ¶ 111.)

But these statements, and others like them alleged in the complaint, are inactionable for more than one reason. First, soft expressions of optimism and projections of future performance not worded as guarantees are immaterial because they are too vague to affect the market. *See Raab*, 4 F.3d at 289-90 (holding that statements that "[r]egulatory changes . . . have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years", and "the DOE Services Group is poised to carry the growth and success of 1991 well into the future" were immaterial puffing) (internal quotation marks omitted

and alterations in original); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994) (holding that statements that "1992 will produce excellent results for Adage," and Adage is "on target toward achieving the most profitable year in its history" were "predictions as to future events", not "statements as to present facts, let alone guarantees", and were therefore immaterial as a matter of law) (internal quotation marks omitted); *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683 (D. Md. 2002) (finding statements such as "[w]hile market conditions remain challenging, we expect to maintain our current dividend rate" and "13% anticipated return" to be immaterial) (internal quotation marks omitted). Constellation's predictions that earnings were expected to grow, which were not worded as guarantees, and statements that the company was well positioned for the future are, therefore, inactionable, as they are precisely the sort of statements courts have held immaterial as a matter of law.

Similarly, Constellation's general statements about its "strong risk management culture" and "effective system of internal controls" are mere puffery. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (finding that statements such as the assertion the defendant "had risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process" were "no more than puffery") (internal quotation marks and alterations omitted). Simply because risk management and internal controls are important to Constellation's business, it does not follow that any individual statement regarding these topics is per se material. *See id*. at 206 (explaining that the plaintiffs were "conflat[ing] the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation" because "[w]hile a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its

integrity per se material"). A reasonable investor could not assume from Constellation's general optimism about its risk management and internal control practices that the company would never lapse in these tasks. *See id*.

Second, to the extent the aforementioned statements are alleged to be misleading because they failed to disclose the insufficiency of Constellation's collateral and/or liquidity and monitoring abilities, and Constellation's alleged exposure to Lehman, they are not misrepresentations or omissions of material fact. As described above, there was simply no material exposure to Lehman specifically that Constellation was required to disclose. Moreover, that Constellation miscalculated its downgrade collateral requirements on one occasion does not mean the company's risk management and internal controls were not generally strong. Furthermore, the plaintiffs have not specifically alleged that the statements about Constellation's liquidity were made at a time when there was any reason to believe Constellation's liquidity was not, in fact, healthy. Thus, the plaintiffs have not "provided a credible explanation for the falsity of [the alleged] statements", and have therefore failed to "nudge[] the [] claims across the line from conceivable to plausible, as required by the minimal pleading standards of Rule 8." *Cozzarelli*, 549 F.3d at 630 (internal quotation marks and citation omitted). Accordingly, no actionable misrepresentation or omission has been alleged with respect to the statements about Constellation's future earnings, business outlook, risk management, and internal controls.

In sum, only Ironworkers' §§ 11 and 12(a)(2) claims based on the misstatement of Constellation's downgrade collateral obligations can survive the defendants' motions to dismiss.

B. *"Immediate Seller" under* § 12(a)(2)

The individual and underwriter defendants also argue that Ironworkers' § 12(a)(2) claim (Count II) should be dismissed as to them because Ironworkers has not alleged that any plaintiffs

purchased any security directly from, or were solicited by, any individual or underwriter defendant.

Section 12(a)(2) provides that any person who "offers or sells a security" by means of a prospectus or oral statement that includes an untrue statement or omission of material fact "shall be liable . . . to the person purchasing such security from him . . ." 15 U.S.C. § 77l(a)(2). Those who offer or sell securities include: (1) persons who directly pass title or interest in a security to a buyer for value, and (2) persons who directly solicit an offer to buy a security. *See Royal Ahold*, 351 F. Supp. 2d at 401 (citing *Pinter v. Dahl*, 486 U.S. 622, 642-51 (1988)). The Supreme Court's holding in *Pinter* limited § 12(a)(2) liability to "immediate sellers", or "those who were directly involved in the actual solicitation of a securities purchase." *Id*. (citing *Pinter*, 486 U.S. at 644 n.21). Thus, "neither involvement in preparation of a registration statement or prospectus nor participation in activities relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status." *Id*. at 401-02 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996)) (internal quotation marks and alterations omitted).

Courts sometimes have found that determining whether a defendant is a statutory seller under § 12(a)(2) is "a question of fact, not properly decided on a motion to dismiss." *Id*. at 402 (internal quotation marks and citation omitted). Where plaintiffs fail even to allege, however, that they purchased securities from or were solicited by the defendant, they fail to state a claim under § 12(a)(2). *See id*. at 406. Although plaintiffs need not allege exactly which plaintiff purchased which security from which defendant, plaintiffs cannot survive a motion to dismiss if they do not allege that any defendant sold them shares or solicited them to buy shares. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) (stating that "plaintiffs must provide a

short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them").  In other words, plaintiffs' allegations "must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser."  *Royal Ahold*, 351 F. Supp. 2d at 406.

The individual and underwriter defendants argue, and the court agrees, that the complaint fails to sufficiently allege statutory seller status.[16]  Ironworkers' counsel acknowledged the complaint's deficiency at oral argument, but stated that Ironworkers can easily identify which defendants sold to or solicited which plaintiffs if granted leave to amend.  Accordingly, Ironworkers' remaining § 12(a)(2) claim as to the inaccurate downgrade collateral obligations will be dismissed as to the individual and underwriter defendants, but with leave to amend.

---

[16]     The allegations against the individual defendants are limited to a statement that the "Individual Defendants' actions of solicitation to promote the Offering included the preparation of the defective and inaccurate Prospectus and Prospectus Supplement."  (Compl. ¶ 219.)  This statement plainly fails to allege a factual basis supporting a direct relationship between any individual defendant and any plaintiff-purchaser.

While the allegations against the underwriter defendants are more extensive, they too are insufficient to state a claim under § 12(a)(2).  For instance, the complaint alleges that "the Underwriter Defendants, acting through their employees, agents, and others, solicited such purchases for their personal financial gain through the preparation and/or dissemination of the Prospectus and Prospectus Supplement."  (*Id*. at ¶ 220.)  It further alleges that the underwriter defendants:

(a) made the decision to conduct the Offering and do it at the price set forth in the offering documents.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and Prospectus Supplement.  The Prospectus was calculated to create interest in Constellation Subordinated Debentures and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; (b) finalized the Prospectus and caused it to become effective; and (c) conceived and planned the Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

(*Id*. at ¶ 222.)  These allegations fail to allege that any plaintiff actually purchased from or was solicited by any defendant and are, therefore, insufficient to state a claim under § 12(a)(2).  *See In re Westinghouse Sec. Litig*., 90 F.3d at 718.

*II.     Count IV: Section 10(b) of the 1934 Act and SEC Rule 10b-5*

On behalf of common stock purchasers, the plaintiffs allege that Constellation and the

officer defendants[17] violated § 10(b) of the 1934 Act and SEC Rule 10b-5 by making the same

misrepresentations and omissions alleged in Counts I and II.

Pursuant to § 10(b) it is:

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Implementing § 10(b), SEC Rule 10b-5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b-5. Rule 10b-5 "encompasses only conduct already prohibited by § 10(b)." *In*

*re Mut. Funds Inv. Litig.*, 566 F.3d 111, 119 (4th Cir. 2009) (citing *Stoneridge Inv. Partners,*

*LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)) (internal quotation marks omitted).

Accordingly, to state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege: "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; (6) and loss causation (that is, the economic

---

[17] The plaintiffs do not allege that the director defendants, other than Defendant Shattuck, who is also an officer defendant, violated § 10(b) and Rule 10b-5.

loss must be proximately caused by the misrepresentation or omission).” *Matrix Capital Mgmt.*

*Fund LP v. Bearingpoint Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (citing *Stoneridge*, 552 U.S. at

157) (internal quotation marks omitted).

Here, Constellation and the officer defendants argue that the plaintiffs have not

adequately pled a material misrepresentation or omission, scienter, or loss causation.  The

standard for assessing materiality is the same under §10(b) and Rule 10b-5 as it is under §§ 11

and 12(a)(2) of the 1933 Act.  *Garber v. Legg Mason*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008)

(citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir. 1991)).[18]

Thus, as the court has already explained, the plaintiffs have failed to allege a material

misrepresentation or omission as to Constellation’s exposure to Lehman, or with regard to

Constellation’s future earnings, business outlook, risk management, or internal controls.[19]

Moreover, for the reasons that follow, the plaintiffs have failed to adequately plead scienter.

Count IV, therefore, will be dismissed.

To survive a motion to dismiss, plaintiffs in private securities fraud actions must meet the

heightened pleading requirements set forth in Rule 9(b) and the PSLRA.  *See Matrix*, 576 F.3d at

181.  The PSLRA requires that the complaint shall: (1) “specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if . . . made on

information and belief, the complaint shall state with particularity all facts on which that belief is

formed”; and (2) “with respect to each act or omission alleged to violate this chapter, state with

---

[18]     Because Rule 9(b) and the PSLRA apply to claims under § 10(b), however, the pleading
standard is higher for allegations of misrepresentations and/or omissions under § 10(b) than for
allegations under §§ 11 and 12(a)(2) that do not sound in fraud.

[19]     The complaint alleges several misstatements that occurred within the Class Period, but
were not incorporated into the registration statement and prospectuses.  *See supra*, note 14.
Although these additional statements were not addressed in the previous section, the analysis
applies equally.

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b).

The PSLRA "unequivocally raised the bar for pleading scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). With regard to each act or omission alleged to be fraudulent, plaintiffs must plead facts that taken together as a whole give rise to a "strong – *i.e.*, a powerful or cogent – inference" of scienter. *Id*. at 323. The inference must be more than permissible or reasonable, it must be "cogent and compelling." *Id*. at 324. The Supreme Court explained in *Tellabs* that to successfully plead scienter as part of a § 10(b) claim, a plaintiff must show that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Thus, under the comparative analysis put forth in *Tellabs*, courts must first determine whether the facts alleged "permit an inference of scienter, and if so, the persuasiveness of that inference." *Matrix*, 576 F.3d at 183. Next, if the court finds the inference that the defendants "acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter," the complaint should be dismissed. *Pub. Employees' Ret. Ass'n of Colorado v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

Under the strong inference standard, negligence is not enough to support a § 10(b) claim. *Id*. "[P]laintiffs must do more than merely demonstrate that defendants should or could have done more" to establish a strong inference of scienter. *Id*. at 314. Rather, plaintiffs may allege scienter by pleading intentional misconduct or severe recklessness. *Cozzarelli*, 549 F.3d at 623. In the § 10(b) context, a reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it." *Pub. Employees' Ret. Ass'n*, 551 F.3d at 313 (internal quotation marks and citation omitted). But "when the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed." *Cozzarelli*, 549 F.3d at 624.

Furthermore, where plaintiffs allege fraud claims against individual defendants, they "must allege facts supporting a strong inference of scienter as to each defendant." *Matrix*, 576 F.3d at 182.[20] "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

The plaintiffs do not allege that Constellation and the officer defendants intentionally misrepresented Constellation's downgrade collateral estimates and its exposure to Lehman, but rather that they acted with severe recklessness. Their theory is that because Constellation's liquidity and capital obligations were so important to its business, it was severely reckless for Constellation and its officers not to have known of essential facts such as its counterparty relationship to Lehman and its downgrade collateral requirements. They further allege that Constellation did not correct the miscalculated downgrade collateral obligations, or disclose its alleged exposure to Lehman, as early as the company could have because the defendants did not want to jeopardize the upcoming Offering. (*See* Compl. ¶ 245.) The allegations in the complaint, however, do not support a strong inference of severe recklessness on behalf of

---

[20]     Following the enactment of the PSLRA, "group pleading", under which "corporate officers and directors who are alleged to be in day-to-day control of the company may be presumed to be collectively responsible for a company's 'group published' information such as prospectuses, registration statements, annual reports, press releases and other public filings", no longer applies to § 10(b) claims. *See Royal Ahold*, 351 F. Supp. 2d at 369 & 370 (internal quotation marks omitted).

Constellation or the officer defendants.[21]

Although in some circumstances it may be reasonable to assume that officers of a company know of facts critical to the company's core operations, *see, e.g., Schleischer v. Wendt*, 529 F. Supp. 2d 959, 974 (S.D. Ind. 2007), that is not the case here. Under the heightened pleading requirements of the PSLRA and Rule 9(b), the overall importance of liquidity to Constellation's merchant energy business is not sufficient on its own to raise a strong inference of scienter on behalf of Constellation or its officers with regard to the miscalculated downgrade collateral obligations. In short, a general level of importance simply does not "warrant imputing to the defendants knowledge of [the] subtleties" of an automated program. *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596-97 (D.N.J. 2005) (finding that "although it is true that Oxandrin is BTG's premier product, this fact alone does not warrant imputing to the Individual Defendants knowledge of subtleties discernable only through detailed study of monthly and quarterly Oxandrin sales data"). Without additional factual allegations that the defendants were somehow aware that the downgrade collateral requirements were miscalculated, or that there was a problem with the automated system, neither Constellation, nor its officers, can be presumed to have known of a faulty computer calculation. *See, e.g., Matrix*, 576 F.3d at 184 (ultimately finding no strong inference of scienter even where plaintiffs had alleged there were red flags informing the defendants of problems with the company's accounting system, and explaining that the weight of these allegations was limited in part because the plaintiffs failed to allege facts implying the defendants were aware of the problems prior to approving the financial statements

---

[21] The complaint generally fails to identify the individual officer defendants in its scienter allegations. Rather, it alleges broadly that the "Defendants" acted with scienter. (*See* Compl. ¶¶ 233-246.) The PSLRA requires, however, that plaintiffs allege facts giving rise to a strong inference of scienter with respect to *each* defendant. *Matrix*, 576 F.3d at 182. Even considering the general allegations against all defendants, however, they are insufficient to raise a strong inference of scienter.

in question). While deliberate ignorance may rise to the level of scienter, simple corporate mismanagement does not. *Bio-Tech. Gen. Corp.*, 380 F. Supp. 2d at 596.

The plaintiffs argue that because the disclosure of the miscalculation occurred after the Offering, Constellation must have discovered the mistake before the Offering, yet delayed revising the estimates until after the Offering. (*See* Pls.' Opp'n at 45.) But there are simply no facts alleged, let alone stated with particularly, to suggest that the defendants knew of the mistake before late July 2008, the date Defendant Shattuck claimed they were discovered. (*See* Compl. ¶¶ 77-78); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (finding scienter had not been pled where the plaintiff had not "specifically identified any reports or statements or any dates or time frame in which Defendants were put on notice of contradictory information") (internal quotation marks and citation omitted); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (holding no scienter had been alleged where the plaintiffs failed to allege that the defendants "had access to information that *specifically* informed them of the alleged flaws in the preparation of PXRE's loss estimate reports") (emphasis in original). The plaintiffs' circular logic cannot substitute for specific factual allegations that the defendants discovered the mistake before the Offering.

Further, it is undisputed that Constellation self-reported its error on August 11, 2008, shortly after the problem appears to have been discovered. This is not a case where the defendants deliberately shut their eyes to information indicating the inaccuracy of their public statements. Rather, the more compelling inference, and the only one supported by the facts alleged, is that Constellation negligently miscalculated its downgrade collateral requirements, failed to discover the mistake until late July 2008, and announced the revised numbers within a

few weeks. Contrary to the plaintiffs' argument, the fact that there was no mention of the miscalculation at the July 31, 2008 conference call does not itself suggest wrongdoing, as the plaintiffs have alleged no facts contradicting Defendant Shattuck's announcement at the August 27, 2008 analyst meeting that the mistakes were not quantified until early August.

Further making the plaintiffs' theory of scienter implausible is the fact that Constellation *overestimated* its downgrade collateral obligations in the event of a one level downgrade, the event the plaintiffs do not dispute was the most likely to occur, and the only one that ever did. Moreover, as the defendants have pointed out, the money raised by the Offering would not have covered the cost of a downgrade. These facts alone negate any inference that Constellation discovered the mistake in June, but waited to disclose the mistake until after the Offering. Even if the court were to find that common sense allows an inference that the defendants acted with the requisite scienter, that inference is not "at least as compelling" as the inference that the defendants were merely negligent with respect to Constellation's misstated downgrade collateral obligations. *See Tellabs*, 551 U.S. at 324. Accordingly, although the plaintiffs have alleged a material misrepresentation sufficient to state a claim under a strict liability theory, they have not alleged scienter sufficient to state a claim for fraud.

The complaint also fails to give rise to a strong inference of scienter with regard to the alleged failure to disclose Constellation's alleged exposure to Lehman. Again, the general importance to Constellation of its counterparty risk is not sufficient on its own to infer scienter on behalf of the company and its officers. Moreover, the statement of CS 1 that Constellation put Lehman on its internal credit-watch list well before September 2008 is similarly insufficient to establish scienter. Even assuming the truth of this allegation, it cannot be reasonably inferred that simply because Constellation was concerned, along with the rest of the market, about

Lehman's financial condition in the summer of 2008, it intentionally or recklessly concealed a material exposure to a company it somehow knew was on the verge of bankruptcy.  *See Plumbers & Steamfitters Local 773*, 694 F. Supp. 2d at 300 (explaining that "knowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud").  As noted earlier, CS 1's statement does not provide critical information such as what criteria informed the placement of a company on the list, or the details regarding Lehman's placement on the list.  Without such information, it cannot be inferred either that Constellation had a material exposure to Lehman, or that Constellation had actual knowledge of Lehman's impending bankruptcy.  As the plaintiffs have failed to allege that the defendants misrepresented or omitted a material exposure to Lehman, it follows that they have similarly failed to allege facts giving rise to an inference of scienter, let alone a strong one.

As a final matter, the plaintiffs' allegations of insider trading do not lead to a compelling inference of scienter on behalf of the officer defendants.  The sales of stock can only imply scienter if the timing and amount are "unusual or suspicious." *Teachers' Ret. Sys.*, 477 F.3d at 184.  But the plaintiffs have alleged no facts as to why sales of stock by Defendants Shattuck, Collins, and DeFontes[22] in February 2008 before Constellation miscalculated its downgrade collateral requirements, and before the defendants are alleged to have been concerned about Lehman's deteriorating financial condition, is suspicious.[23]  Moreover, the one sale that occurred

---

[22]     The defendants also allege that Defendant Martin made insider trades, but Defendant Martin is not named as a defendant in Count IV.

[23]     The defendants correctly dispute the plaintiffs' characterization of the stock sales, arguing that three of the five trades alleged were actually exercises of stock options rather than straight sales of stock.  (*See* Individual Defs.' Mem. Ex. A.)  Each of Collins's sales, on February 1, 2008 and May 12, 2008, respectively, and DeFontes's sale on February 12, 2008, involved a purchase of shares pursuant to the exercise of stock options and a sale of the same number of shares.  (*See id.*)  The exercises of stock options were also done pursuant to Rule 10b5-1 trading

on May 12, 2008 was still before Constellation allegedly put Lehman on its internal credit-watch list. Additionally, each of the alleged sales by Defendants Shattuck, Collins, and DeFontes were made pursuant to Rule 10b5-1 trading plans, in other words, pursuant to trading instructions that pre-dated the Class Period. (*See* Individual Defs.' Mem. Ex. A.) "Stock sales pursuant to Rule 10b-5 trading plans 'can raise an inference that the sales were prescheduled and not suspicious.'" *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (quoting *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007)). Without specific factual allegations suggesting the sales were unusual or suspicious, the plaintiffs' insider trading allegations do not imply that the officer defendants acted with the requisite scienter.[24]

For all the above-stated reasons, the plaintiffs have also failed to raise a strong inference of scienter with regard to the general statements about Constellation's future earnings, business outlook, risk management, and internal controls. Furthermore, the PSLRA requires that a complaint "shall, with respect to *each act or omission* alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind", 15 U.S.C. § 78u-4(b)(2) (emphasis added), and the plaintiffs have not done so with respect to each of these allegedly misleading statements. Accordingly, Count IV will be dismissed in its entirety.

---

plans. (*See id.*)

[24] In addition, the plaintiffs' allegations that the officer defendants acted recklessly when they certified Constellation's public filings in accordance with the Sarbanes-Oxley Act do not raise an inference of scienter. The Fourth Circuit held in *Cozzarelli* that the "bare allegation" that a defendant "lied when she certified [the company's] financial statements in accordance with the Sarbanes-Oxley Act of 2002" did "not provide independent support for an inference of scienter." 549 F.3d at 628 n.2. Here, the plaintiffs ask the court to infer that because the officer defendants signed Sarbanes-Oxley certifications for Constellation's public offerings, they must have been severely reckless, given the company had miscalculated its downgrade collateral requirements and had allegedly failed to disclose its exposure to Lehman. (*See* Compl. ¶ 248.) But on their own, such allegations similarly fail to provide support for an inference of scienter.

*III.*     *Counts III & V: Control Person Liability*

The plaintiffs also allege that the individual defendants (officers and directors) are liable jointly and severally under § 15 of the 1933 Act for violations of §§ 11 and 12(a)(2) (Count III), and that the officer defendants in particular are liable under § 20(a) of the 1934 Act for violations of § 10(b) (Count V).

Pursuant to § 15 of the 1933 Act, persons in control of any person found liable under § 11 or § 12(a)(2) may be jointly and severally liable.  15 U.S.C. § 77o.  To state a *prima facie* case under § 15, "the plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))".  *Royal Ahold*, 351 F. Supp. 2d at 407 (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003)) (internal quotation marks omitted).

Furthermore, under § 20(a) of the 1934 Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Just as with a § 15 claim, to state a claim under § 20(a), a plaintiff must allege: "(1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator."  *Mut. Funds*, 566 F.3d at 129-30.  Once the plaintiff establishes a *prima facie* case of control, the burden shifts to the defendant to show a lack of culpable participation or knowledge. *Id*. at 130.

"Control" has the same meaning under § 15 of the 1933 Act and § 20(a) of the 1934 Act. *Initial Pub. Offering*, 241 F. Supp. 2d at 393.  To plead control a plaintiff must "plead facts showing that the controlling defendant had the power to control the general affairs of the entity

primarily liable at the time the entity violated the securities laws . . . and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Mut. Funds*, 566 F.3d at 130 (internal quotation marks alterations omitted). SEC regulations define control as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (for the 1933 Act); 17 C.F.R. § 240.12b-2 (for the 1934 Act). Generally, control is a "complex factual question," not ordinarily appropriate for resolution on a motion to dismiss, unless "a plaintiff does not plead any facts from which it can be reasonably inferred the defendant was a control person." *Mut. Funds*, 566 F.3d at 130 (internal quotation marks and citations omitted).

As an initial matter, where a plaintiff has failed to state a viable underlying securities violation, no § 15 or § 20(a) liability exists. As explained above, the plaintiffs have failed to adequately plead a violation of § 10(b) or Rule 10b-5. Thus, their § 20(a) claim against the officer defendants must be dismissed. For the reasons stated below, Ironworkers' § 15 claim also will be dismissed as to the director defendants, but will be allowed to go forward as to the officer defendants.[25]

An individual's position alone does not establish control person liability. *See In re Cryomedical Sci., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1020 (D. Md. 1995) ("neither status nor position, in and of themselves, are sufficient for § 20(a) liability"). Here, Ironworkers alleges that the "Officer and the Director Defendants each were control persons of Constellation by virtue of their positions as a director and/or officer of Constellation . . . [and] each had a series of

---

[25]     The court notes that Ironworkers has only alleged viable §§ 11 and 12(a)(2) claims as to Constellation's misstated downgrade collateral requirements. Accordingly, Ironworkers' § 15 claim as to all other alleged misrepresentations and omissions will be dismissed.

direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Constellation." (Compl. ¶ 229.) It further alleges that the "Officer and Director Defendants each were culpable participants in the violations of § 11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed." (*Id*. at ¶ 230.) Ironworkers argues that these allegations are sufficient to state a § 15 against the director defendants, but the court disagrees.

The two cases relied upon by Ironworkers, *Royal Ahold* and *Huttenstine v. Mast*, 2006 WL 3771096 (E.D.N.C. Dec. 21, 2006), which held that control person liability had been sufficiently alleged against director defendants, involved specific allegations that the directors had direct involvement in the day-to-day operations of the company. *See Royal Ahold*, 351 F. Supp. 2d at 409 (finding that it was possible to infer from the complaint that several defendants who "served on Royal Ahold's Executive Board, the body directly responsible for managing the company," who had "direct and supervisory involvement in the day-to-day operations of the companies", and who "influenced and controlled directly or indirectly the decision-making of the companies . . .", were control persons); *Huttenstine*, 2006 WL 3771096 at * 7 & *9 (finding control person liability had been adequately pled where the director defendant was alleged, among other things, to have "directly participated in the management of the Company, [and] was directly involved in the day-to-day operations of the Company . . ."). No such allegations have been pled here, however, and the court cannot infer simply from the director defendants' positions on Constellation's board of directors that they exercised the requisite control over the specific corporate operation that resulted in the miscalculated downgrade collateral obligations to be liable under § 15. Accordingly, Ironworkers' § 15 claim will be dismissed as to the director

defendants, except as to Defendant Shattuck, who is also an officer of Constellation.

Defendant DeFontes, an officer defendant, also argues that Ironworkers has failed to allege that he was a control person under § 15 because he is the President and CEO of BGE, a Constellation subsidiary, and therefore does not control Constellation.  Because control is a complex factual question, however, dismissal of Ironworkers' § 15 claim against DeFontes is not appropriate at this stage in the litigation.  The defendants have not argued that Defendants Shattuck and Collins did not control Constellation.  Accordingly, Ironworkers' § 15 claim against the officer defendants may go forward as to the misstated downgrade collateral requirements.[26]

## CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss will be granted in part and denied in part.  Plaintiff Ironworkers will be given leave to amend its § 12 claims against the individual and underwriter defendants as to the inaccurate downgrade collateral statement.  A separate Order follows.

_____August 13, 2010_____
Date

_____/s/_____
Catherine C. Blake
United States District Judge

---

[26]     In light of the above rulings, there is no need to address the defendants' other arguments at this time.