# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| In re CONSTELLATION ENERGY GROUP, | : | |
| INC. SECURITIES LITIGATION | : | |
| | : | |
| | : | Civil No. CCB-08-02854 |
| | : | |
| | : | |
| | : | |

## MEMORANDUM

Now pending in this securities class action is the plaintiffs' motion to file a Third Amended Complaint ("TAC") and to re-introduce claims the court previously dismissed. Defendants filed motions to dismiss plaintiffs' first amended complaint, and the court granted the motions in part and denied them in part. *See In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614 (D. Md. 2010).  Subsequently, Ironworkers St. Louis District Council Pension Fund ("lead plaintiff") filed a second amended complaint, after which the parties engaged in an informal discovery process aimed at facilitating settlement.  Lead plaintiff alleges in the instant motion and attached amended complaint that discovery produced new evidence of scienter and materiality, supporting claims the court had dismissed.  Defendants have filed opposition briefs, lead plaintiff has filed a reply, and the court heard oral argument on the motion on November 4, 2011.  Defendants have also filed a motion to seal.  For the following reasons, the plaintiff's motion to file an amended complaint will be denied, and defendants' motion to seal will be granted.

1

## I.  BACKGROUND

The facts and legal standards articulated in the court's prior opinion are incorporated by reference.  Of the series of events discussed therein, the following three are particularly relevant to the motion under consideration here.  First, on June 27, 2008, Constellation Energy Group ("Constellation") undertook a public offering of subordinated debentures to raise liquidity for its energy trading portfolio, raising approximately $435.8 million before expenses.  Second, on August 11, 2008, Constellation acknowledged that prior to the offering the company had reported incorrect figures for its cumulative collateral obligations in the event of a credit rating downgrade—understating one of the figures by over $1.6 billion.  Finally, on September 15, 2008, after Lehman Brothers Holdings Inc. ("Lehman") filed for bankruptcy, Constellation disclosed to the Securities and Exchange Commission ("SEC") that Constellation had certain business relationships with Lehman and its subsidiaries, a fact that plaintiffs allege had not been properly disclosed in Constellation's quarterly filings during the class period or in the registration statement and prospectus for the debenture offering.  During this time period, the market prices for the debentures from the June offering and for Constellation's common stock dropped, leading to this class action lawsuit.

In the first amended complaint, the lead plaintiff brought various causes of action on behalf of purchasers of the June 2008 debenture offering and of Constellation common stock during the class period.  The plaintiffs alleged securities law violations by Constellation, certain Constellation officers and directors (collectively, the "individual defendants"), and various financial institutions that had acted as underwriters for Constellation ("underwriter defendants").  On behalf of the debenture purchasers, the plaintiffs alleged that all defendants violated §§ 11

and 12(a)(2) of the Securities Act of 1933 ("the 1933 Act") by making misrepresentations and omissions in the registration statement and prospectuses for the debenture offering.   The plaintiffs alleged that the individual defendants are liable for these violations as control persons under § 15 of the 1933 Act.   On behalf of the common stock purchasers, plaintiffs alleged that Constellation and the officer defendants violated § 10(b) of the Securities and Exchange Act of 1934 ("the 1934 Act") and SEC Rule 10b-5 by making the same misrepresentations and omissions with respect to the offering, as well as others occurring between the offering and the end of the class period—in particular the failure to disclose Constellation's business dealings with Lehman prior to that company's bankruptcy.   The plaintiffs alleged that the officer defendants were liable under § 20(a) of the 1934 Act for these violations.

After defendants' original motions to dismiss, the court determined that the first amended complaint did not include sufficient factual allegations to support the scienter requirement of fraud or severe recklessness for claims under the Private Securities Litigation Reform Act of 1995, P.L 104-67 ("the PSLRA").   All claims based on the 1934 Act were therefore dismissed. The first amended complaint also failed to adequately allege the existence of any material exposure to Lehman, and thus could not support the allegation that Constellation had improperly failed to disclose the Lehman relationship—for the purpose of either the 1933 or 1934 Act. Finally, and for various reasons, none of the other alleged Constellation misstatements concerning future earnings, business outlook, risk management, or internal controls were actionable under either Act.

Thus, only a limited set of claims survived the first motion to dismiss.   The downgrade collateral requirement misstatements prior to the June 2008 debenture offering met the

materiality requirement of the 1933 Act, and therefore survived.  And, while the court found the first amended complaint lacked proper factual allegations to hold the individual or underwriter defendants liable as "immediate sellers" under § 12(a)(2) of the 1933 Act, the plaintiffs were given leave to amend the complaint to remedy the problem.  To address these shortcomings, the lead plaintiff filed a second amended complaint eliminating the dismissed claims and adding specific allegations to address the "immediate seller" concerns.  The defendants filed answers, and the parties began negotiating over scheduling and discovery.

In early 2011, the parties agreed to postpone formal discovery in favor of an informal process under which Constellation voluntarily produced a total of 10,372 pages of material. (ECF No. 130.)  In reviewing this material, the plaintiffs "found substantial evidence supporting scienter" and therefore began to proceed with formal discovery by serving requests for production of documents on both Constellation and the underwriter defendants.  (Pl. Mot. to File Third Am. Compl. 6–7, ECF No. 138-1).  In addition to the requests for documents, the lead plaintiff took the deposition of five current and former Constellation employees, including Julie Xie, the former Constellation employee who had been responsible for calculating the downgrade collateral requirement estimates; Khalid Abedin, Constellation's former Head of Credit; and John R. Collins, the company's former Chief Risk Officer and Chief Financial Officer.  The lead plaintiff bases the third amended complaint on information from both the informal and formal discovery processes.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) encourages district courts to "freely give leave

[to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Fourth Circuit has counseled, however, that "leave to amend is not to be granted automatically."  *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987).  Rather, "[d]isposition of a motion to amend is within the sound discretion of the district court."  *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  A district court may deny leave to amend "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)).  An amendment is futile "when the proposed amendment is clearly insufficient or frivolous on its face," *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986), or if the amended claim would "still fail to survive a motion to dismiss" pursuant to Fed. R. Civ. P. 12(b)(6).  *Perkins v. U.S.*, 55 F.3d 910, 917 (4th Cir. 1995).

## III. DISCUSSION

In filing the motion for leave to amend, the lead plaintiff contends new evidence procured during discovery addresses the deficiencies in the claims this court previously dismissed.  The lead plaintiff argues discovery has provided new evidence of scienter with regard to the misstated credit downgrade collateral requirement calculations, supporting the previously dismissed claims under the 1934 act.  Additionally, lead plaintiff argues, discovery revealed evidence that Constellation was in fact materially exposed to Lehman Brothers, which would allow the allegation of failure to disclose this exposure to support claims under both the 1933 and 1934 Acts.  And finally, lead plaintiff argues, some of this same new information supports the

conclusion that Constellation statements about the strength of its internal controls should be found materially misleading and therefore actionable under both Acts.

As an initial matter, the defendants argue that the PSLRA prohibits plaintiffs from using information obtained through discovery to revive previously dismissed claims. The PSLRA contains a provision that automatically stays discovery "during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). As lead plaintiff notes, however, this discovery stay does not explicitly apply where, as here, discovery proceeded after defendants' motion to dismiss had been disposed of by the court.

"It is well settled that when interpreting any statute, a court must first look to the plain meaning of the language, used by Congress." *In re Carnegie Intern. Corp. Sec. Litig.*, 107 F. Supp. 2d 676, 679 (D. Md. 2000) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "'[I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent,' judicial inquiry ends." *Id.* (quoting *Robinson*, 519 U.S. at 340). Here, the plain language of 15 U.S.C. § 78 u-4(b)(3)(B) applies to discovery "during the pendency of any motion to dismiss," and not to discovery properly pursued after a claim has survived.

Defendants argue that the same policy considerations underlying the automatic stay before a motion to dismiss should apply here, where only a narrow claim has survived a motion to dismiss and plaintiff attempts to use information from discovery on that claim to re-introduce other previously dismissed claims. As defendants note, in passing the PSLRA Congress was concerned about

the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action.

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007) (quoting H.R. Rep. No. 104–369, at 41 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 730–31).  The purpose of the stay provision, therefore, is "to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that corporate defendants will settle those actions rather than bear the high cost of discovery, *see* H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 736, or that the plaintiff will find during discovery some sustainable claim not alleged in the complaint, *see* S. Rep. No. 104-98, *reprinted in* 1995 U.S.C.C.A.N. 679, 693."  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 249 (D. Md. 2004) (quoting *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002)).

Defendants argue that these principles "would be easily frustrated if plaintiffs, after having speculative fraud claims dismissed but narrower claims sustained, could simply employ the discovery process  . . . to resuscitate the previously dismissed fraud claims . . . ." (ECF No. 145, at 9.)  The court cannot agree.  The purpose of the PSLRA provision at issue is to limit the pressure on innocent defendants to settle cases in lieu of proceeding to expensive discovery, *see In re Royal Ahold*, 220 F.R.D. at 249, but it is not meant to shield all defendants from any adverse evidence that may properly be discovered over the course of litigation.  Federal civil procedure provides other sanctions for parties that abuse the discovery process; and, as defendants here also urge, Fed. R. Civ. P. 15(a) gives the court ample discretion to deny leave to file an amended complaint where the plaintiff has pursued discovery in bad faith.[1]  The court

---

[1] The court does not in this case find that the plaintiffs proceeded in bad faith.

need not read into the PSLRA a limit that Congress did not create.

The cases defendants cite are properly distinguished.  In *Greebel v. FTP Software, Inc.*, the court stated that it would deny leave to amend a complaint following a motion to dismiss where the only remaining claim had "since turned out to be groundless."  182 F.R.D. 370, 376 (D. Mass. 1998).  As defendants rightly point out, allowing leave to amend in such a situation would incentivize plaintiffs to attempt to hoodwink the court into allowing a groundless claim to advance in order to seek discovery.  Similarly, in *In re Bisys Sec. Litig.*, the plaintiffs had stipulated that all claims against one of the defendants were dismissed with prejudice.  496 F. Supp. 2d 384, 386 (S.D.N.Y. 2007).  Later, after claims against the remaining parties had already been settled, the plaintiffs sought leave to amend the complaint and re-introduce claims against the defendant originally dismissed.  Given the posture of the case, the judge properly concluded that prejudice to the previously dismissed party outweighed any countervailing factors.  *Id.* Here, no such concerns exist.  The surviving claims have not been found to be groundless, and plaintiffs do not request the court re-open a case against a party already dismissed with prejudice. *Cf. Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3th Cir. 2007) ("If a private securities case proceeds past the pleadings stage against a corporation and discovery reveals individual culpability, a plaintiff may seek permission to amend the complaint to assert claims against individual defendants." (citing Fed. R. Civ. P. 15)); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 790 (N.D. Cal. 2005) ("If as a result of discovery, plaintiffs learn of facts that would support claims against [an individual officer defendant] sufficient to meet the pleading requirements for fraud and scienter, they may attempt to amend the complaint at that time." (footnote omitted)).

Lead plaintiff has adequately explained the process by which new evidence was produced through informal discovery, and the court is satisfied that the PSLRA does not prohibit an amended complaint based on the information defendant has produced.  Nonetheless, as discussed below, lead plaintiff's third amended complaint fails to cure the deficiencies the court identified in the first amended complaint.  The lead plaintiff's motion for leave to file an amended complaint will therefore be denied as futile.

## A.  Credit Downgrade Collateral Obligations

The court previously found the first amended complaint did not contain sufficient factual allegations regarding the misstated credit downgrade collateral obligations to support the scienter requirement for 1934 Act claims.  Scienter may be shown by properly pleaded allegations of intentional conduct or severe recklessness.  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).  In the third amended complaint, lead plaintiff provides new evidence it argues satisfies either standard, though it focuses the argument on proving severe recklessness.[2]  The court, again, cannot agree.  The PSLRA requires a plaintiff to plead "with particularity" sufficient facts to raise a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  The Act "unequivocally raised the bar for pleading scienter."  *Cozzarelli*, 549 F.3d at 624 (quoting

---

[2] Lead plaintiff bases its argument for an inference of intentional misconduct on allegedly new evidence that the contracts excluded from the downgrade calculations were "primarily" coal contracts.  (TAC ¶ 7, ECF 138, Ex. B.) In Q1 of 2008, Constellation had suffered two defaults by coal-related counter-parties, which meant its first two wholesale credit losses ever.  (*Id.* at ¶ 67.)  Thus, plaintiffs argue, it is "inconceivable" that Constellation could have "inadvertently" excluded primarily coal contracts.  (*Id.* at ¶ 8.)  As defendants correctly contend, however, the plaintiff already presented these same facts in their first amended complaint.  (*See* FAC ¶¶ 78, 80, 82–83, ECF No. 51.)  The court's prior decision listed various facts that tend to discount plaintiff's narrative—including, significantly, that defendants disclosed the misstatements before they had successfully raised enough capital to overcome any deficit the new calculations would identify.  To the extent defendants intended to fraudulently misstate their downgrade collateral obligations in order to bolster their cash position, this early disclosure of the misstatement clearly would and did exacerbate the problem they ostensibly were attempting to remedy in the first place.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal quotation marks omitted)).  Lead plaintiff's new evidence of alleged recklessness does not meet the PSLRA's high bar.

The Fourth Circuit repeatedly has held that for the severe recklessness standard to be met defendants must have been aware of the problems at issue before a misleading statement is made. *See Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009) (holding reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003))); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

Thus, in assessing the previous motion to dismiss in this case, the court found it significant that the plaintiffs had alleged no specific evidence that Constellation or its officers knew of the faulty downgrade calculation prior to the misstated disclosure.  738 F. Supp. 2d at 635 ("Without additional factual allegations that the defendants were somehow aware that . . . there was a problem with the automated system, neither Constellation nor its officers can be presumed to have known of a faulty computer calculation.").

Lead plaintiff now argues that new evidence acquired during discovery suggests Constellation officers did in fact know that there was a problem with the automated system prior to the June 27, 2008, debenture offering and related disclosures.  Lead plaintiff contends Constellation officers "blatantly ignored" the "repeated and routine complaints about missing

contract information" by Ms. Xie, the Constellation employee in charge of making the downgrade collateral calculations.  (TAC ¶ 128.)  To support this claim, lead plaintiff points to deposition testimony of Mr. Abedin, Constellation's Head of Credit, and to "e-mails produced in this action that Xie sent and compiled to 'prove [her] innocence.'"  (TAC ¶¶ 124–25.)

According to this newly produced information, lead plaintiff contends, "at least as far back as 2007 Xie was aware that there was some credit information missing from some of the contracts that were entered into the systems."  (TAC ¶ 124.)  Xie met with Abedin and Collins at regular monthly meetings to explain the liquidity report.  (TAC ¶ 122.)  And, "[a]ccording to Abedin, Xie would 'complain' about [missing information] on a 'routine basis.'"  (TAC ¶ 124.) Xie "repeatedly sent requests to credit analysts asking that updated or completed information be entered into the systems correctly."  (*Id.*)

In addition, lead plaintiff cites two other specific email communications.  On July 28, 2008, Senior Vice President Brenda Boultwood, then Constellation's Chief Risk Officer, sent an email to Collins describing the problem resulting in the misreported downgrade figures as a "long-standing issue."  (TAC ¶ 129.)  And Vice President Jason Sohmer sent an email that described the process of correcting the misstatements as "trying to clean up *years* of sh*t." (TAC ¶ 130 (emphasis in original).)

Despite the well-known problems with the database system, lead plaintiff emphasizes that the first time defendant Collins ever proposed a "deep dive" be done into the Company's downgrade collateral figures was July 2008 (TAC ¶ 124), a full year after the July 2007 partial automation of the system that defendants claim was the source of the problem.  Lead plaintiff also points to an internal Constellation investigative report that found that there were "no

documented controls" on the calculations process.  (TAC ¶ 10.)

While the court does not agree with defendants that the PSLRA prohibits the plaintiffs from utilizing new evidence produced during discovery, the court finds the new evidence presented here insufficient under the PSLRA to overcome the weaknesses already identified in plaintiffs' claims.   Under the elevated PSLRA "particularity" and "strong inference" pleading standard, vague allegations of prior knowledge are not sufficient.   "Recklessness is adequately alleged when a plaintiff *specifically* allege[s] defendants' knowledge of facts or access to information contradicting their public statements."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535–36 (S.D.N.Y. 2009) (emphasis added) (internal quotation marks and citation omitted).  And, as the Fourth Circuit has explained, "to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more."  *Pub. Emps.' Ret. Ass'n*, 551 F.3d at 314.  Rather, they must demonstrate that defendants were "so reckless in their duties as to be oblivious to malfeasance that was readily apparent."  *Id.*

The Fourth Circuit decision in *Matrix Capital* provides a helpful point of reference. There, stock purchasers had brought suit against BearingPoint after the company disclosed it had overstated accounts by $92.9 million.  576 F.3d at 178–79.  The panel noted that "[a] strong inference of scienter [of recklessness] might arise when there are sufficient red flags to alert senior officers to the unreliability of statements about internal controls and financial information."  *Id.* at 188 (citing *Ottmann*, 353 F.3d at 351).  As with Constellation, BearingPoint was attempting to integrate a new financial reporting system, and their employees often "manually bypassed the OneGlobe system, correcting at least some of OneGlobe's errors."  *Id.* at 184.  But, as the panel noted, "[e]ven if BearingPoint began introducing OneGlobe earlier,

problems may not have become obvious until after the program was fully implemented and was functional for some amount of time." *Id.*

The Fourth Circuit panel approved of the *Matrix Capital* district court's dismissal of the plaintiff's complaint, but reversed the district court's denial of leave to amend. In explaining the decision, the panel noted that "the proposed amended complaint added allegations relating to the time frame in which red flags became obvious to [individual officer defendants]," citing specific individuals and times at which they learned about the magnitude of the reporting problems. *Id.* at 195. Importantly, the panel noted, "senior employees . . . refused to sign off on financial statements . . . because it was known that the financial data was not accurate due to the problems associated with OneGlobe." *Id.* at 195–96.

Here, on the other hand, there is no indication that either Xie or her Constellation supervisors knew of the magnitude of the reporting problems until July 2008 when Abedin proposed the "deep dive." Defendants do not allege with specificity what problems Xie was aware of, when she became aware of them, or when she communicated this information to her superiors. Plaintiffs have alleged that Xie was aware that "there was some credit information missing from some of the contracts that were entered into the systems" as far back as 2007. (TAC ¶ 124.) This language does not, however, allege that Xie was aware of the extent of the reporting problem, or that the problem was not correctable through manual efforts. Plaintiffs allege that Xie complained about missing information on a "routine basis" and that she spent considerable amount of time pestering other departments for missing information. (TAC ¶ 124.) While this suggests that Abedin and Collins likely knew that the partial automation of the process was imperfect, there is no suggestion here that Xie was unsatisfied with the responses

13

she received from other departments or that she believed that even after her manual efforts the final numbers were misstated.  The email communications were similarly vague and ambiguous. As defendants argue, calling a problem "long-standing" does not necessarily suggest that *knowledge* of the problem was long-standing, and knowledge is the ultimate touchstone for the purpose of determining recklessness.

Of course, the argument can be made that *any* problems with the database should have raised red flags with Xie and with Abedin, Collins and others—and that a "deep dive" of the system should therefore have been executed before July 2008.  But because Constellation was implementing a new reporting system, as in *Matrix Capital*, it is equally plausible to infer that it would take time for the company to realize the significance or cause of any missing information. To the extent that Xie only began working with the partially automated system in the latter half of 2007, then the timeframe between the causation of the problem and when it was discovered is short enough to suggest simple negligence, not severe recklessness.  After all, Xi was meeting with supervisors to discuss issues monthly, and a "deep dive" was done in July 2008.  Within a year of implementation of the new system, the problem was fixed.

Digging a little deeper, plaintiffs do not allege Xie had knowledge that there was a pattern of which contracts were not successfully included in the calculations or that the particularly volatile coal contracts made up many of the contracts that had been left out.  And, even if she did in fact know that coal contracts were often being excluded from the calculations, it is not clear that this fact should have been considered a red flag in 2007.  Plaintiffs allege that coal prices "had increased 153% in the first half of 2008," which was an "unprecedented" increase that "was a topic of conversation during executive management's weekly risk

14

management committee meetings." (TAC ¶ 65.)  Thus, even if Xie did know that coal contracts in particular were disproportionately being excluded from her calculations, such a fact would only have taken on the kind of significance plaintiffs attribute to it at some point during the first half of 2008.  Given that the "deep dive" was requested in July of 2008 and the numbers thereafter swiftly corrected, there is no indication that more than a few months passed between when coal prices should have raised red flags and when the problem was identified and corrected.

In sum, while the third amended complaint contains new evidence of prior knowledge, it falls short of the kind of particularity and proof of severe recklessness found sufficient to survive a motion to dismiss under the PSLRA.  Even where discovery afforded plaintiff access to an email sent by Xie to "prove [her] innocence" and five depositions, plaintiffs' allegations remain unspecific and ambiguous.  As discussed above, the PSLRA expressly requires plaintiffs to state "with particularity" facts supporting a "strong inference" of scienter.  *Teachers' Ret. Sys.*, 477 F.3d at 184 (quoting 15 U.S.C. § 78u-4(B)(2)).  Here, despite this particularity requirement, the third amended complaint contains only a rough sketch of Xie's knowledge and when she conveyed it, without any quotations to the specific language used.  The court can only assume that, even after significant discovery, more specific factual allegations do not exist at this time.

Without the kind of specific allegations *Matrix Capital* suggested might be sufficient, negligence—as opposed to severe recklessness—may be the proper level of scienter inferred.  *Matrix Capital*, 576 F.3d at 188.  And, as noted in the court's previous opinion, the PSLRA requires a plaintiff to show that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

alleged." *In re Constellation*, 738 F. Supp. 2d at 634 (quoting *Tellabs*, 551 U.S. at 324). "[I]f the court finds the inference that the defendants 'acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter,' the complaint should be dismissed." *Id.* (quoting *Pub. Emps.' Ret. Ass'n*, 551 F.3d at 313).

In weighing the competing inferences, the court views the allegations in the complaint "in their totality and in light of all the evidence in the record." *Pub. Emps.' Ret. Ass'n*, 551 F.3d at 313. The job of the court "is not to scrutinize each allegation in isolation but to assess all of the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. Thus, the court also considers plaintiff's additional new allegations, including that an internal Constellation investigative report produced during discovery found "no documented controls" around the downgrade calculations, and "no formal sign-off of the review." (TAC ¶ 10.) Because the downgrade collateral figures were so critical to Constellation's business model, the lead plaintiff argues, this report language "essentially admits to severe recklessness." (ECF No. 159, at 7.) At the very least, lead plaintiff contends, such a failure to maintain internal controls is a violation of Generally Accepted Accounting Principles (GAAP). (*Id.* at 13.)

The court does not, however, agree that these new allegations "essentially admit" to severe recklessness. That an action is "improper under accounting guidelines . . . is not the standard [for severe recklessness], which 'requires more than a misapplication of accounting principles.'" *Pub. Emps.' Ret. Ass'n*, 551 F.3d at 314 (quoting *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). Despite the relatively strong language of the internal report, Constellation did have *some* controls over their downgrade risk evaluation. They had an employee, Xie, assigned to the task of calculating downgrade collateral obligations, and Xie had

the authority to follow up with other employees to attempt to assure that the calculations were accurate. Xie met with senior management regularly and discussed with them the issues she was having with the calculations. And, while the deep dive did not come soon enough to save the plaintiffs from relying on the misstated numbers, it is undisputed that Constellation ordered an in-depth analysis of the number within a year of the partial automation of the process and within several months of the "unprecedented" increase in coal prices.

After carefully considering the third amended complaint and all of lead plaintiff's new factual allegations related to the downgrade collateral obligations, the court concludes that an inference of negligence remains more powerful than an inference of severe recklessness. Accordingly, the third amended complaint would fare no better than the first amended complaint when challenged by a 12(b)(6) motion to dismiss. Granting lead plaintiff leave to file an amended complaint based on new downgrade collateral evidence therefore would be futile.

### B. Exposure to Lehman

Lead plaintiff's renewed allegations about Constellation's exposure to Lehman Brothers are equally unavailing. In addition to the downgrade collateral misstatement, plaintiffs argued in the first amended complaint that Constellation improperly omitted from financial statements any disclosure of the company's exposure to Lehman prior to that company's bankruptcy filing. The court previously rejected this argument, noting any failure to name Lehman specifically as a counterparty in the offering documents was not an actionable omission because 1) the plaintiffs had not sufficiently alleged the existence of "material exposure" to Lehman, and 2) Constellation had "warned generally of counterparty risks," which should have been sufficient to put buyers on

notice.  *In re Constellation*, 738 F. Supp. 2d at 628.  The third amended complaint has failed to cure these defects.

In the first amended complaint, the plaintiffs alleged that Constellation had added Lehman to an internal "Credit Watch List."  The court found this allegation insufficient to support the inference that Constellation was materially exposed to Lehman and therefore should have disclosed such in offering documents.  The complaint did not allege "information about the criteria used for putting a company on the list, or the details surrounding the decision to put Lehman on it, and thus [the statement did] not reasonably lead to the inference that Constellation was materially exposed to Lehman."  *Id.* at 629.

During discovery, defendants produced three documents on which lead plaintiff bases the renewed claims.  First, defendants produced two different documents titled "Watch List" in some way; one document lists only 6 companies and a larger one lists over 200 companies.  (ECF No. 145 Exs. F & G.)  The larger document, entitled "Credit Watch List – Counterparties With CSA: Data as of: 30-Jun-2008" includes both Lehman and its subsidiary Eagle Energy Partners I, LP. (TAC ¶ 12.)  Neither Lehman nor Eagle Energy is on the short list.  According to plaintiffs, Abedin testified at his deposition that the "Credit Watch List" was a "key document" for determining the Company's "heightened credit issues."  (*Id.*)

Constellation does not dispute Abedin's statement, but contends that he is referring to the document with a shorter list of companies on which Lehman does not appear.  (ECF No. 145, at 19.)  In their depositions, Abedin and Collins both were asked directly if the larger document was a credit watch list and expressly answered that it was not.  (*Id.*)  Indeed, as plaintiffs admit, the larger list was "200+ counterparties" and "was circulated and used as part of the effort to

18

correct the downgrade collateral issue." (TAC ¶ 138.)  In reviewing the attached documents, the court concludes that no reasonable jury could find the larger list to be the Credit Watch List plaintiffs allege it is, as the list contains over two hundred counterparties with a very wide range of credit ratings and numerical values, and the email to which it is attached and related deposition testimony can only support the opposite conclusion.

The third document lead plaintiff cites as new evidence is another internal document, a July 2008 Executive Risk Summary reporting that Lehman was the third-largest driver of increase in letters of credit at Constellation "since the beginning of 2008."  (TAC ¶ 12.)  As defendants explain, however, this meant that *Constellation owed Lehman* money, not the other way around.  The parties debate the materiality of this fact.  Because markets were so volatile, lead plaintiff argues, this relationship could have swung in the other direction depending on natural gas prices.  (ECF No. 150, at 19.)  Defendants point out that no evidence exists that Lehman ever owed money to Constellation, and that when Lehman went bankrupt, Constellation properly reported that the firm had no "direct net credit exposure" to Lehman.  (ECF No. 144, at 7–8 (citing Constellation's 9/15/09 SEC Form 8-K).)

The court finds defendant's argument more compelling.  Taken together, plaintiff's new evidence suggests only that 1) Lehman was one of over *two hundred* companies whose credit mattered to Constellation and 2) Constellation owed Lehman money.  Had the evidence instead shown Lehman owing large amounts to Constellation, an omission of such a relationship might plausibly have been material in the months leading up to the Lehman bankruptcy.  But, it is a stretch to suggest that the large sum Constellation owed to Lehman should have been disclosed.  Indeed, given that Constellation had no direct net credit exposure to Lehman, it remains unclear

19

what plaintiffs believe Constellation should have disclosed and when.  In the previous opinion, the court noted plaintiffs had not given a persuasive answer to this question, and the plaintiffs have again failed to do so.  As a result, neither the new credit downgrade collateral calculation facts nor the new Lehman facts support leave to file an amended complaint.

### C.  General Statements about Risk Management and Internal Controls

Finally, the lead plaintiff contends new evidence should change the court's previous determination that Constellation's general statements about its risk management systems were mere "puffery."  (ECF no. 150, at 16–17.)  In various filings, Constellation claimed that the company had a strong risk management program, stating for example that the company's approach to risk management "is predicated on a strong risk management culture combined with an effective system of internal controls."  *In re Constellation*, 738 F. Supp. 2d at 630.  In dismissing plaintiff's prior claims based on these statements, the court concluded that these general statements were "mere puffery" and therefore not material and not actionable.  *Id.* (citing *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009)).

Lead plaintiff now points to the newly-discovered internal Constellation report that attributes misreporting of downgrade collateral requirements to "absence of either manual or automated reconciliations between certain supporting systems" and states that the calculations were "reviewed by GCG Credit management, but there are no documented controls around this activity and . . . no formal sign-off of the review."  (TAC ¶¶ 10, 127.)  Lead plaintiff argues that generalized statements about strong risk management and internal controls may be construed as

puffery where at least *some* internal controls are in place, but that such a statement is materially misleading where the company has admitted that in fact no internal controls exist *at all*.

As discussed above, however, the court is skeptical that the report can be read to suggest that Constellation had no internal controls at all.  Constellation did after all have a reporting system for counter-party credit risk, and a staffer in charge of reviewing the numbers (Xie).  And Xie did meet with supervisors and discuss the numbers.  As plaintiffs acknowledged in the third amended complaint, "[a]ccording to Xie, she would explain the liquidity report to Abedin and defendant Collins during regular monthly meetings." (TAC ¶ 122.)).

Further, as the court has previously explained at length, it is not sufficient that a statement be misleading for it to be actionable as a violation of federal securities laws.  The misstatement must also be material, 738 F. Supp. 2d at 624, which is to say that the documents "would have misled a reasonable investor about the nature of the securities."  *Id.* at 625 (quoting *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 455 (D. Md. 2000)).

That Constellation in fact had "no documented controls" over their downgrade collateral calculations does not change the fact that the company's general statements about their risk management practices were vague enough that "a reasonable investor would not depend on [them]."  *ECA*, 553 F.3d at 206.  In other words, "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every [similar company] makes these statements."  *Id.*  The addition of the internal investigative report, therefore, does not change this court's conclusion that Constellation's general statements about risk management were immaterial and therefore not actionable.[3]

---

[3] In support of the argument that Constellation "lacked any meaningful internal controls" during the class period, lead plaintiff also recently provided the court with a copy of a settlement agreement between the Federal Energy

## IV.   MOTION TO SEAL

Constellation and the individual defendants have filed an unopposed motion to seal portions of the amended complaint and the related briefs.   Local Rule 105.11 requires that a party seeking to seal documents offer reasons supported by specific factual representations justifying the sealing and an explanation for "why alternatives to sealing would not provide sufficient protection."  Local Rule 105.11 (D. Md. 2011); *see Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 120–21 (D. Md. 2009).

Defendants argue that the stipulated protective order entered by the court in this case (ECF No. 126) provides the justification for sealing portions of the documents at issue.  The order was entered to expedite the exchange of discovery material and protect discovery material such as certain trade secrets or other business information entitled to be kept confidential.  Now, instead of requesting that all of the documents and briefing be sealed in their entirety, defendants have specified individual portions to be redacted.  Defendants' request appears narrowly tailored to a compelling interest and therefore will be granted.  *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (holding the more rigorous First Amendment right of public access to court documents "may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest"); *Pittston Co. v. U.S.*, 368 F.3d 385, 406 (4th Cir. 2004) (holding that a district court did not abuse its discretion in refusing to unseal documents covered by a stipulated protective order covering "confidential,

---

Regulatory Commission (FERC) and Constellation over unjust profits from Constellation's energy trading operations.  (ECF No. 160.)  The settlement, however, deals with an entirely different area of Constellation's business operations and thus is not particularly relevant here.  Moreover, to the extent that the settlement does show weak internal controls at the company, it does not affect the court's above conclusion that Constellation's general and unspecific statements about risk management were "mere puffery."

proprietary, commercial, or financial data").

## **<u>CONCLUSION</u>**

Because it fails to remedy the problems with the first amended complaint, the third amended complaint is insufficient on its face and would not survive a subsequent motion to dismiss.  Leave to amend must therefore be denied as futile.

A separate order follows.


_____March 28, 2012_____                    _____/s/_____
Date                                                                    Catherine C. Blake
                                                                        United States District Judge